## Morse v. Commonwealth.

(Decided October 3, 1924.)

### Appeal from Caldwell Circuit Court.

1. Intoxicating Liquors—Search Warrant Not Supported by Affidavit Illegal.—Search warrant not supported by affidavit was illegal under Constitution, section 10, though issued by justice of peace, who himself discovered presence of liquor at place to be searched, notwithstanding Criminal Code of Practice, section 31.

2. Criminal Law—Common Experience that Men Shelter Valuable Possessions in House Other than Dwelling House.—Court knows from common experience and ordinary observation that men often have protected and sheltered many of their valuable possessions in houses other than their dwelling houses, as affecting construction to be given constitutional provision against searches and seizures.

3. Intoxicating Liquors—Searches and Seizures—Dugout in Hillside Some Distance from Dwelling Held "House" Within Constitutional Provision as to Searches and Seizures.—Dugout in hillside, quarter mile from dwelling house on farm, with three dirt walls

and one wall of man's making, with place of entry and exit, and top protecting from elements, with hole for smoke, in which landowner had still, was "house," within Constitution, section 10, relating to searches and seizures.

4. Intoxicating Liquors—Competent Evidence Held Sufficient to Authorize Submission of Unlawful Manufacture to Jury.—Independent of evidence disclosed by forcible search and seizure, evidence held sufficient to authorize submission of question of unlawful manufacture to jury.

OTHO H. ANDERSON for appellant.

T. B. McGREGOR, Attorney General, and LILBURN PHELPS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

From a conviction under an indictment charging him with the unlawful manufacture of spirituous liquor, appellant appeals.

Boitnott, a justice of the peace, and a resident of the same neighborhood, on one Saturday was passing through appellant's farm, along a path or roadway about fifty or seventy-five yards from the edge of some timber on the side of a hill; thinking he detected the odor of whiskey, or the mash used in making it, he left the path or roadway and went into the timber in search of the source of the odor. He found what he and the other witnesses refer to as a "dugout" in the side of the hill. There had been a sort of excavation in the hillside and the sidewalls of the structure, and presumably the rear wall, were the hill itself, but in front there was a door securely fastened and locked. No other opening in the structure is referred to except that on the top, and in the improvised roof was a hole left, or put there, presumably for the escape of smoke. Boitnott did not at the time force his way into the dugout, but peered through the opening in the top; it being dark therein, however, he could only discern the elbow of a pipe, and saw nothing more at that time. There was a deputy sheriff in the neighborhood to whom Boitnott disclosed these things, and on the same day the two again visited the place and took with them a flashlight which they used in looking through the hole in the roof. In this way they discovered some barrels in the dugout, and a stove pipe leading up near to the hole. The two officials continued to watch the place for a day or two, and during that time saw appellant and another going toward

and coming from the direction of the dugout, but did not see either of them enter it. On the following Tuesday the two officers, with some others who were deputized, went to the place and the door still being securely locked and fastened, was, under the orders and directions of the officials, prized open by force, and there were found therein several barrels of mash, some half-barrels and some empty barrels, some tubs and buckets, some peaches and a candy jar about half full of whiskey. About 100 or 150 yards away a still was found which some of the witnesses that morning had seen appellant and another moving from the direction of the dugout.

No one saw the still in operation by appellant or any one else, although there was physical evidence it had been operated in the dugout.

When the door of the structure was thus forcibly opened and the evidence disclosed, the officials and those deputized by them were acting under a search warrant signed by Boitnott, the justice of the peace. There was, however, no affidavit filed before the justice authorizing the issue of the search warrant, the only authority therefor being a certificate signed by the justice and appended to the search warrant, wherein he, in his official capacity, ordered the search made,

"after seeing distill, barrels of malt, and pipe lines connected to same on the farm of Price Moose,"

to which there is signed the name of the justice in his official capacity.

Manifestly the search warrant was invalid and its issual unauthorized, for under the express terms of section 10 of our Constitution no such warrant shall be issued

"without probable cause supported by oath or affirmation."

It is true section 31 of the Criminal Code purports to give to a magistrate the power to issue a warrant of arrest from his personal knowledge, but even that provision which has reference alone to warrants of arrest has been expressly declared to be unconstitutional and void, in so far as it purports to authorize the issual of even a warrant of arrest upon the magistrate's personal knowledge. Clark v. Hampton, 163 Ky. 698.

The lower court properly held the search warrant was invalid, but permitted the introduction of the evidence disclosed by the search upon the idea that it was such a case as did not require a search warrant. The question is then whether the "dugout" on appellant's farm, a quarter of a mile from his dwelling house, is protected from search under the provisions of section 10 of the Constitution.

That section by its terms explicitly guarantees that

"the people shall be secure in their persons, houses, papers and possessions from unreasonable search and seizure."

The language of the quoted provision convincingly shows on its face it means to include more than a mere dwelling house when it uses the word "houses;" an individual ordinarily has one dwelling house, but he often has other houses used by him in connection therewith, and the fact that the provision uses the plural, and not merely the singular, would appear to be conclusive it was the purpose to protect from unreasonable search not only the dwelling house but other houses, and especially such other houses as are erected on his farm where his dwelling house is situated and used in connection therewith, and as a part of his domicile. We know from common experience and ordinary observation that men often have protected and sheltered many of their valuable possessions in houses other than their dwelling houses, and in the light of this knowledge and the use of the plural word in the constitutional provision, it would be abortive of its plain purpose to say its meaning was to protect from unreasonable search only the dwelling house.

But was the structure designated as a "dugout" in fact a house? It had four sides, it had a door securely locked and fastened, and it had another aperture in the roof apparently for the escape of smoke. It is true three of what might be termed the walls of the structure were furnished by digging back into a hill, but these three walls were supplemented by a fourth in front, and there was placed over the four a roof or covering of some kind designed to protect the persons and things therein from the elements. The three walls produced by the excavation in the hillside, while furnished by the hill itself, were really brought about and constructed by the labor furnished by man in making the excavation, while the

fourth wall in front was wholly of man's making, and he arranged it all so that he could have an opening in the wall so wholly constructed by him, and could at his pleasure fasten or unfasten that opening. The very fact that this structure was designed to, and did, protect from the elements those who might use it, as well as the personal possessions that might be placed in it, appears to make it conclusive that it was in fact a house; and this is all emphasized by the fact that it had a place of entry and exit, and that the place might be securely locked and fastened.

We are constrained, therefore, to the belief that the so-called "dugout" was a house within the meaning of section 10 of the Constitution, and as such is embraced in the constitutional inhibition against unreasonable searches and seizures. 30 C. J., p. 472; 21 Cyc., p. 1112; Goater v. Ely, 80 N. J. Eq. 40.

It results from what has been said the evidence disclosed by the search was, under many opinions of this court, imcompetent.

But wholly independent of the evidence disclosed by this forcible search, there was sufficient evidence to authorize the submission of the case to the jury. The house was on appellant's land and under his control; he and another were seen the very morning of the search carrying a still away from it, and that still was found 100 or 150 yards away. Appellant had been seen more than once within a few days going to and coming from the direction of this structure, and there was a well beaten pathway leading from it to appellant's home, and there was a roadway showing wagon tracks and slide tracks from this structure right up to or near appellant's house. In addition to these and other circumstances, there is evidence of his bad reputation as to the making and handling of illicit liquor.

Because of the error in admitting the evidence disclosed by the illegal search, the judgment is reversed with directions to grant appellant a new trial and for further proceedings consistent herewith.

Whole court sitting. Chief Justice Sampson and Judge McCandless dissenting.

### DISSENTING OPINION BY JUDGE McCANDLESS.

Our court is committed to the doctrine that evidence procured by unreasonable search is inadmissible in a trial of a criminal case. In defining these words it has in some cases practically held that every search made by a public officer is unreasonable, unless it is technically legal in every respect (Youman v. Commonwealth, 189 Ky. 152; Ash v. Commonwealth, 193 Ky. 452; Mattingly v. Commonwealth, 197 Ky. 584; Jordan v. Commonwealth, 199 Ky. 335), and that any observation or discovery made by a public officer while on private premises is a search, even without overt act upon the part of the officer; and unless he is present at the invitation of the owner or under authority of a valid search warrant such observation constitutes an unreasonable search and he is not permitted to testify as to it. (See Jordan and Mattingly cases, *supra,* cases in which the writer did not sit).

In the Youman case it was said that the constitutional provision against unreasonable search and seizure "is broad enough to and does include every article and species of property." But in Brent v. Commonwealth, 194 Ky. 504, it was held that the inhibition would not apply to a search of woodland remote from the owner's residence, the court saying: "The framers of those constitutions had inherited no practice nor tradition that impelled them to safeguard the vast tracts of land, but profiting by the experience of their forefathers they were desirous of preserving inviolate the person of every citizen and those possessions intimately associated with his person, his house, his papers and his effects."

.The rule was established before I became a member of the court. Since then it has had the approval of a majority of the members. Entertaining a different view, I have avoided fruitless contentions, acquiescing in the more liberal construction given in the Brent case. But the majority opinion in this case is so drastic that I feel impelled to dissent and in so doing to give my views upon the entire matter.

The doctrine of exclusion is a departure from basic principles. The object of judicial inquiry is to ascertain the truth and it is the policy of the law to restrict opportunities for falsehood. To this end, even in the absence of statute, we find that at common law defendants in criminal cases were not permitted to testify in their own behalf or compelled to incriminate themselves; confes-

sions obtained by hope of reward or fear of punishment were excluded; parties were not permitted to testify as to transactions with a deceased person, or persons under disability or as to acts performed by such persons; confidential communications to one's consort or to his legal or spiritual adviser were also privileged.

Different reasons have been given for these rules, but the principal one is that such evidence offers too much temptation for perjury and is therefore unreliable and untrustworthy. No such reason exists against evidence procured by search. Ordinarily it consists of physical elements and is of trustworthy character, and its exclusion is practically a suppression of the truth. Indeed, so far as my observation extends, in all the history of the common law no instance can be found in which, if otherwise competent, evidence was excluded because illegally obtained. The near unanimity of the text writers on the subject is impressive.

"For this reason it has long been established that the admissibility of evidence is not affected by the illegality of the means through which a party has been enabled to obtain the evidence. The illegality is by no means condoned, it is merely ignored." Wigmore on Evidence, section 2183, also section 2184.

"The question of the admissibility of evidence improperly obtained may be here considered. Though papers and other objects of evidence may have been illegally taken from the possession of the party against whom they are offered or otherwise unlawfully obtained this is no valid objection to their admissibility if they are pertinent to the issue. The manner of their procurement, however reprehensible, will not prevent their use as evidence so long as the person against whom they are used has not been constrained by the court to produce them." Jones on Evidence, section 884; also Greenleaf on Evidence, section 254.

In an exhaustive monographic note beginning on page 135, vol. 136, A. S. R., the able editor of that publication collates the decisions up to that period (1910), and on page 137 states the general rule as traced through two hundred years of American and English jurisprudence in almost the identical language quoted above from Jones on Evidence. After citing pages of authorities

and quoting various reasons for the rule, the learned author continues:

"Others might be advanced, having their roots in the principles of logic and based upon the nature and properties of evidence and its purposes. Such, for example, is that heretofore referred to, that the object of evidence is to elicit truth, and it can never be said that the probative value of any evidentiary fact is affected in the smallest particular by the manner or the means whereby the fact itself was obtained. Its credibility may be and often is affected by the method of its acquisition, but except as hereinafter stated never the admissibility thereof.'

The learned author, after criticising Boyd v. U. S., 116 U. S. 616, and other Supreme Court decisions, asserts that the prevailing view in the majority of the states is contrary to that opinion.

It is said in the Encyclopedia of Evidence:

"Nor is it a valid objection to the admission of an article in evidence that the article was procured by the party offering it, in an irregular or illegal way, or that it was procured as the result of an illegal search or seizure, nor is the admission of an article, no matter how obtained, objectionable as compelling a party to be a witness against himself." (Vol. 4, page 276, and authorities cited.)

"The evidence will not be excluded because illegally or wrongfully obtained, since the court will not stop to inquire into such collateral matters." (Vol. 3, page 181, and authorities cited.)

"The fact that evidence has been secured by an unlawful search of a person or premises of the defendant in a criminal case will not serve to exclude it. Nor does its introduction violate the constitutional immunity from unlawful searches and seizures or require the defendant to furnish evidence against himself unless the unlawful act is done by an order of the court." Vol. 3, page 182, and citations.

"The fact that evidence was obtained by, or came to the knowledge of an officer while acting wrongfully, under a warrant, or wholly without a warrant, will not affect its competency." Vol. 7, page 745, and authorities cited.

"Written instruments which are obtained as the result of an illegal search are nevertheless admissible if otherwise competent." Vol. 14, page 708, and authorities cited.

Late authorities are collated in an exhaustive note in 3 A. L. R. 1515 and 24 A. L. R. 1408, and it may be said that numerically the great weight of authority cited is to the effect that such evidence is admissible. A further collation and analysis *pro* and *contra* are given in State v. Owens (Mo.), 259 S. W. 100.

In an address before the American Bar Association published in August, 1922, American Bar Association Journal, Mr. John H. Wigmore makes this reference to the doctrine of exclusion:

"It offends in the first place by trying a violation of law without that due complaint and process which are indispensable for its correct investigation. It offends in the next place by interrupting, delaying and confusing the investigation in hand, for the sake of a matter which is not a part of it. It offends further in that it does this unnecessarily and gratuitously, for since the persons injured for the supposed offense have not chosen to seek redress or punishment directly and immediately at the right time and by the proper process, there is clearly no call to attend to their complaints in this indirect and tardy manner. The judicial rules of evidence were never meant to be an indirect process of punishment. It is not only anomalous to distort them to that end, but it is improper (in the absence of express statute) to enlarge the fixed penalty of the law, that of fine and imprisonment, by adding to it the forfeiture of civil right through loss of the means of proving it. The illegality is by no means condoned, it is merely ignored."

Originating in Boyd v. U. S., 116 U. S. 616, the rule was questioned in Adams v. New York, 192 Ky. 585, but is now fully established in that great court. Weeks v. U. S., 232 U. S. 383; Gouled v. U. S., 255 U. S. 298; Amos v. U. S., 255 U. S. 313; Silverthorne Lumber Co. v. U. S., 251 U. S. 385.

Those decisions emphasize the theory that the Fourth and Fifth Amendments are correlated, and should be interpreted in the light of each other; that the primary object of a search is to procure evidence; that to admit evi-

dence procured by unreasonable search is to compel the accused to give evidence against himself; that such procedure violates both amendments and relief should be afforded under the Fourth Amendment by a return of the sequestered property and under the Fifth Amendment by excluding all evidence thus procured. It is further held that the Fourth Amendment applies only to public officials and therefore the inhibition would not apply to searches made by private citizens, regardless of the force or duress used, and in the federal courts the same exception is applied to searches made by state officers.

Our court has ignored the self-incriminating provisions and bases its decisions squarely on the inhibition against unreasonable searches. With the highest respect for these authorities I cannot agree with either line of interpretation.

The provisions relied upon are: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing seized." Fourth Amendment.

"No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." Fifth Amendment.

All state constitutions contain provisions similar in substance and meaning; sections 10 and 11 of our Constitution being such.

Unquestionably the inhibition against unreasonable search authorizes the owner to recover property thus taken from him, but the attempt to connect that provision with the one inhibiting self-incrimination presents a different question.

The Fifth Amendment is not a regulation of enforcement officers, but a rule of evidence directed to the court alone for the protection of the accused. It contains no exceptions, no qualifications. It makes no reference to the Fourth Amendment nor to a search, and reasonably interpreted must apply alike to all matters coming within its purview.

If evidence procured by forcible search constitutes compulsory self-incrimination then all such evidence is inadmissible, regardless of the reasonableness or character of the search, whether official or otherwise.

*Vice versa,* if the evidence thus procured upon a reasonable search does not fall within the inhibition of that provision it has no application to any searches. The principle is admirably stated in People v. Mayen, 188 Cal. 237:

"This means, as we understand it, that one charged with the commission of a crime has the right at all stages of the investigation to stand silent and inert before his accusers. If he is required to contribute by word or act to the evidence against himself, his constitutional right is invaded. Such was the situation in Boyd v. U. S., *supra,* which is cited as authority on this point in the decision last referred to. But to apply such an interpretation to the surreptitious or forcible seizure of incriminating evidence, even from the possession of the defendant, would bar the use of all information emanating from the acts or possessions of such defendant not voluntarily furnished. In the face of such an interpretation of the Constitution, how could the law authorize the search of the person of one arrested for crime and use the evidence of his guilt thus secured? How could a witness who had by trespass or dissimulation witnessed or overheard incriminating acts or statements of the accused be permitted to testify? How could articles used in the commission of a crime be taken from the premises of the defendant by authority of a search warrant to be used in evidence, as is permitted by section 1524 of our Penal Code? In each instance suggested the incriminating facts would be involuntarily forced from the possession of the accused."

Equally cogent is the reasoning in State v. Flynn, 36 N. H. 64.

"It seems to us an unfounded idea that the discoveries made by the officers and their assistants, in the execution of process, whether legal or illegal, or where they intrude upon a man's privacy without any legal warrant, are of the nature of admissions made under duress, or that it is evidence furnished by the party himself upon compulsion. The information thus acquired is not the admission of the party, nor evidence given by him in any sense. The party has in his power certain mute witnesses, as they may be called, which he endeavors to keep out of sight, so

that they may not disclose the facts which he is desirous to conceal. By force or fraud access is gained to them, and they are examined to see what evidence they bear. That evidence is theirs, not their owners. If a party should have power to keep out of sight or out of reach, persons who can give evidence of facts he desires to suppress, and he attempts to do that, but is defeated by force or cunning, the testimony given by such witnesses is not his testimony, nor evidence which he has been compelled to furnish against himself. It is their own. It does not seem to us possible to establish a sound distinction between that case and the case of the counterfeit bills, the forger's implements, the false keys or the like, which have been obtained by similar means. The evidence is in no sense his.''

The history of these provisions does not show any connection between the two in the past. Both are declaratory of common law principles, but they were developed at different periods and were designed to meet different situations.

That against compulsory self-incrimination originated in the courageous defense made by John Lilburne beginning in the year 1637. Both the ecclesiastical and common law courts had exercised the right to examine an accused person under oath, even to the extent of inquisitorial torture.

By his petition to parliament in 1640 partial relief was obtained and as a result of the legal and parliamentary contest thus begun, the present doctrine was slowly developed and fully established by the time of the restoration in 1688, practically a century before the question of search and seizure became acute. It seems, however, to have always been restricted to compulsory testimonial self-incrimination, and for the reasons above indicated I think such is the clear meaning of the constitutional provision, though this would include the compulsory production and identification of documents and exhibits by the accused. Boyd v. U. S. could be based on the latter ground. Its error lies in confusing the two constitutional provisions.

Eliminating the question of self-incrimination, and considering the rule from the standpoint of the provision against unreasonable search and seizure, which, as above

stated, alone forms the basis of our opinions, it cannot in my opinion be sustained.

The Fourth Amendment is a guaranty of sacred rights, not a rule of evidence. Its object and purpose is to protect society, not to free criminals. It denounces the acts of unreasonable search and seizure, but provides no penalties or methods of enforcement.

For its violation, however, the wronged person, whether good or bad, may have his action for the trespass and also prosecute the offender at common law. To grant immunity to a criminal whose guilt is uncovered by the search, a remedy that may not be invoked by the innocent, is to favor the criminal and in effect to place a premium on crime.

Certainly there is nothing in the language of the provision that either expressly or impliedly authorizes such a construction, and in adopting the rule, it seems to me, the court places itself in a very embarrassing attitude. The acts denounced are the unlawful invasion of the rights of privacy; the act is complete when the search or seizure is made, and should not be confused with the subsequent use of the evidence thereby seized.

> "It is difficult to see any constitutional connection between the illegal seizure and the use of the thing seized as evidence. The act the Constitution prohibits is the seizure, not the use of the article seized. The violation of the constitutional provision would seem to be complete when the seizure is made, and in that case the only remedy or redress the wronged party has is an action against the wrongdoer—the person who made the seizure." State v. Chuchola, 120 Atl. 212.

> "The search and seizure are complete when the goods are taken and removed from the premises. Whether the trespasser converts them to his own use, destroys them, uses them as evidence, or voluntarily returns them to the possession of the owner, he has already completed the offense against the Constitution when he makes the search and seizure and it is this invasion of the rights of privacy and the sacredness of a man's domicile with which the Constitution is concerned." People v. Mayen, 205 Pac. 440.

To my mind these propositions have not been squarely met.

In justification our decisions have consistently followed the Youman case, in which it is said:

"Will courts established to administer justice and enforce the laws of the state receive, over the objection of the accused, evidence offered by the prosecution that was admittedly obtained by a public officer in deliberate disregard of law for the purpose of securing the conviction of an alleged offender? In other words, will courts authorize and encourage public officers to violate the law and close their eyes to methods that must inevitably bring the law into disrepute in order that an accused may be found guilty? Will the high court of a state say in effect to one of its officers that the Constitution of the state prohibits the search of the premises of a person without a search warrant, but if you can obtain evidence against the accused by so doing you may go to his premises, break open the doors of his house and search it in his absence or over his protest, if present, and this court will permit the evidence so secured to go to the jury to secure his conviction?

"It seems to us that a practice like this would do infinitely more harm than good in the administration of justice; that it would surely create in the minds of the people the belief that the courts had no respect for the Constitution or laws when respect interfered with the ends desired to be accomplished. We can not give our approval to a practice like this. It is much better that a guilty individual should escape punishment than that a court of justice should put aside a vital, fundamental principle of the law in order to secure his conviction. In the exercise of their great powers courts have no higher duties to perform than those involving the protection of the citizen in the civil rights guaranteed to him by the Constitution, and if at any time the protection of these rights should delay or even defeat the ends of justice in the particular case, it is better for the public good that this should happen than that a great constitutional mandate should be nullified. It is trifling with the importance of the question to say, as some courts have said, that the injured party has his cause of action against the officer, and this should be sufficient satisfaction. Perhaps so far as the rights of the individual are concerned this might answer, but it does not meet the demands of the law-abiding pub-

lic who are more interested in the preservation of fundamental principles than they are in the punishment of some petty offender.''

If instead of intoxicating liquor the officers had found in Youman's residence the mutilated body of a murdered man, together with sufficient evidence to fix the crime of murder upon Youman, would the same conclusion have been reached? Could the same patriotic sentiments have been so eloquently expressed? (Indeed in one case a distinction has been suggested as between crimes and misdemeanors. State v. Owens, 259 S. W. 109.)

Passing this inquiry, from the arguments advanced in that and similar cases, it appears that where an officer is a prosecuting witness, that the writers either give him the status of a party or that of an agent for the Commonwealth and in a vague way attempt to apply the rules relating to counterclaim, set off and estoppel. It is unnecessary to add that such procedure is unknown to the criminal law. If such practice were permissible, it must be remembered that the offending officer is liable for the trespass in the same way and to the same extent both civilly and criminally as he would be if he were a private citizen, and if he is required to make full amends to both the accused and to the Commonwealth for the trespass, I cannot see how the courts ''authorize or encourage the commission of the offense or shut their eyes to the violation of the provision.'' The guilty accused has committed a public offense, so has the offending officer. Two wrongs do not make a right, nor can one be set off against the other and the effect of both be neutralized.

Certainly it is the duty of the courts to exercise their high powers in upholding constitutional rights, but this is not accomplished by suppressing the truth in evidence, as this does not punish the officer for his trespass and results only in freeing the criminal. But if both have violated the law each should be punished in accordance with his offense.

As above suggested, it is conceded that evidence obtained by a private citizen in an illegal search is admissible, and it has never been intimated that in so holding the courts ''approve the manner of the obtention of the evidence or encourage a violation of law.'' But as the constitutional inhibition refers to official seizures it is argued that a violation of this provison by enforcement officers is more serious than a mere trespass by a private citizen and therefore, if it does not create an estoppel,

that as a matter of public policy, the courts should enforce this provision by penalizing the Commonwealth in the exclusion of its evidence.

Considering this: Aside from the matter quoted, *supra*, it is claimed that the framers of our Constitution had witnessed the abuses suffered in Great Britain and the colonies by virtue of such warrants, the practice of which had grown up despite the common law, and with those matters fresh in their minds the amendments to our federal Constitution and the various similar provisions in our state constitutions were adopted.

Doubtless that is correct. The judicial history of both countries during that period teems with denunciations of the practice of issuing illegal search warrants, and numerous cases may be cited in which injured persons recovered large sums in damages for illegal searches.

The contest was over the legality of the procedure, not of the evidence. If the warrants so issued had been upheld, the injured party had no redress. This was the practice which James Otis denounced and which caused him to resign his office as prosecutor and to volunteer as attorney for the defense. But my attention has not been called to a single case tried during that period in which evidence thus procured was held to be inadmissible, and when the illegality of the practice of thus issuing such warrants was determined by the court it seems to have been conceded that the injuries suffered could be recompensed by the civil or criminal common law courts.

Naturally the framers of our Constitution knew all of this; clearly they were guarding against the issue of such writs in the future. If they had intended for those provisions to so apply to peace officers as to render inadmissible evidence that had theretofore been admissible it is reasonable to conclude that they would have so stated in those instruments. Their failure to do so strongly indicates that they deemed the common law rules adequate, both for the enforcement of the constitutional provisions and also for the protection of the individual. The adoption of the Fifth Amendment and similar provisions in the state constitutions emphasizes this point and demonstrates that the framers of those instruments laid down rules of evidence when they deemed it essential.

It is significant that the act of Congress of November 23, 1921, was the first and is the only legislation,

state or national, that has been enacted upon this question. It makes no reference to evidence.

It is more significant that almost a century had passed after the adoption of these provisions before any court, either state or federal, discovered that they were intended to make an exception to the general rules of evidence, or that the exclusion of evidence illegally obtained was essential for their enforcement.

During that period no attempt was made to draw a distinction in the admission of such evidence as between private citizens and peace officers. I am still unable to perceive any. If, as said in the Youman case, "a suit at law against the officer will answer so far as the individual rights of the defendant are concerned," why will not a criminal prosecution against the officer satisfy the general public? It certainly will unless the penalty is too light. If this is not sufficiently severe it is within the province of the legislature and the congress to increase it, and I cannot understand how "it is trifling with the importance of the question" for the courts to enforce all law. To my mind public policy demands such enforcement and also obedience to all constitutional provisions, and it is unwise to select or choose which shall be given prominence. If, as is intimated, a zealous official, who in the discharge of his duty oversteps constitutional bounds is more dangerous to society and more reprehensible than a criminal, by all means let us punish the officer, not nulify the rules of evidence.

To my mind such procedure instead of increasing respect for law, will inevitably produce confusion in our decisions, embarrass trial courts, bewilder peace officers and encourage criminals.

For the reasons stated, I am convinced that the rule stated is not based upon a sound premise, and that it will not stand the test of time.

If this were a pioneer case in Kentucky, this opinion would logically end here. We have, however, a different situation. The rule is a part of our law, sustained by numerous decisions; and by reason of the sincere convictions and great ability of the majority members favoring it, there is no prospect of its withdrawal in the near future.

Under such circumstances, without compromising my own views, I feel that I may with propriety insist that as the court has made and promulgated the rule it should reasonably define its terms and its limitations.

If we assume that some of the rights protected by the constitutional provision are so essential to the independence of every freeman as to be sacred, and that on grounds of public policy the courts will not tolerate any interference with them by a public official in violation of that instrument or permit him to divulge information thus acquired, we may yet give a reasonable definition to the words "unreasonable search" in a way that will classify the rights the court assumes to protect.

It is conceded that at common law and under the Code any one, officer or otherwise, may without a warrant arrest and search a person whom he has reasonable grounds to believe has committed a felony; also a public officer may, under the Code and at common law, could without a warrant arrest and search a person for an offense committed in his presence, and such searches are considered reasonable.

As to how he may determine if a concealed offense is being so committed is a mooted question; clearly he can not arrest and search on mere suspicion nor can he act on information and belief, but his conclusions should be drawn to some extent at least from his own perceptions. On the other hand, he is not required to be in possession of all the details of such an offense before acting.

If by sight, hearing or smell the officer acquires evidence of a present offense, and this together with the conduct and demeanor of the suspected person, and other facts and circumstances known to the officer, are sufficient to lead a reasonably prudent person to believe and the officer does in good faith believe that an offense is being so committed, and upon arrest and search of the suspected person, discovers evidence confirming his conclusion, this should be a reasonable search and seizure. Such practice has been substantially adopted in a number of federal courts. Ex Parte Merrill, 35 Fed. 26; U. S. v. Rembert, 284 Fed. 996; Herine v. U. S., 276 Fed. 806; Cachina v. U. S., 283 Fed. 35; Katriner v. U. S., 276 Fed. 808; U. S. v. Hilsinger, 284 Fed. 585; McBride v. U. S., 284 Fed. 416. Under such circumstances it would seem that a conveyance might also be searched.

But aside from searches following an arrest whose validity depends upon a "reasonable seizure," all of the courts recognize the distinction between different classes of property as affecting the question of the reasonableness of the search.

In its latest enunciation the Supreme Court says:

"The only shadow of a ground for bringing up a
case is drawn from the hypothesis that the examina-
tion of the vessels took place upon Hester's father's
land. As to that, it is enough to say that apart from
the justification, the special protection accorded by
the Fourth Amendment to the people in their 'per-
sons, houses, papers and effects' is not extended to
open fields. A distinction between the latter and
the house is as old as the common law. Blackstone's
Com., 223-25-26." Hester v. U. S., 44 U. S. 445.

The sections quoted from Blackstone refer to bur-
glary and the character of house that may be burglarized
—the residence. The residence is the "castle" of which
so much it written, and apparently the court meant to so
restrict the rule.

As stated above, this court in Brent v. Common-
wealth restricted the rule to "the person of every citizen
and those possessions intimately associated with his
person, his house, his papers and his effects." In that
case the evidence was discovered in a woodland on de-
fendant's premises, a quarter of a mile from his house.
It was held competent.

In Richardson v. Commonwealth, 205 Ky. 434, the
evidence was discovered in defendant's hog pen 350
yards from his house and it was held competent. Other
cases might be cited, but these are sufficient to demon-
strate a recognized property classification in the appli-
cation of the rule. Analogous thereto Congress in the
act referred to, *supra,* has also recognized the distinc-
tion by placing occupied dwellings in one class and all
other property in another and providing a heavy penalty
for the search of the former without a warrant, regard-
less of intent; and the same penalty for a similar search
if the latter is made maliciously and without probable
cause.

It is immaterial whether the distinction is drawn
in defining the constitutional words or in limiting the rule
promulgated by the court.

As it is conceded that the *reasonableness* of the
search is determined by the kind and character of the
property searched, it follows that its application is con-
trolled by a reasonable property classification.

Considered from this standpoint we may safely fol-
low Brent v. Commonwealth, *supra,* which, after an elab-
orate discussion of the meaning and interpretation to be

given the words used in the constitutional provision, upheld the rule but denied its application to a still found in a woodland 300 or 400 yards from the owner's residence. Its conclusions were that "they (the framers of the Constitution) were desirous of preserving inviolate the person of every citizen, and those possessions intimately associated with his person, his house, his papers and his effects, hence they incorporated in their original laws federal and state provisions designed to effectuate the purpose." Generally speaking, this would limit the rule to searches of the person, the private baggage and papers and the residence, including curtilage. Why should it be extended? There is nothing sacred about farming lands, enclosed or open, or about a shop or manufacturing establishment, nor a vehicle in which a person is riding, whether a public or private conveyance.

A search of the latter class of property without a warrant violates the rights of the owner and he may have redress therefor, but it is inconceivable that the framers of our Constitution contemplated that the truth should be suppressed by a denial of evidence thereby obtained— nor do I think that the court is authorized in promulgating such a rule. The majority opinion in this case applies the rule to a dugout illicit stillhouse located at a place on appellant's farm, far removed from any habitation.

I cannot assent to this.

### DISSENTING OPINION BY CHIEF JUSTICE SAMPSON.

I am of opinion that there was abundant competent evidence offered by the Commonwealth and heard upon the trial to warrant the submission of the case to the jury and to sustain the verdict, even if all evidence obtained under and by reason of the search warrant be excluded. There was much evidence to the effect that odors of fermenting mash, still beer, came from the little "dugout" in which accessories to the distillery were later found, and from which there was strong evidence that the still proper had been spirited away by appellant only a few hours before the officers with the search warrant opened the place. We have repeatedly held that a fact may be known and established by either of our five senses: sight, hearing, smell, taste and touch. Hardly any better test of the fermentation or distillation of spirituous liquors exists than the odor which arises from the process of manufacture of such spirits. Such odors excite the olfactory

nerves of the human body.  A witness who has had ex-
perience in one or more of many ways may well and safely
say that odors are, or are not, from a distillery in which
intoxicating liquors are being made.    This fact estab-
lished, the jury in this case might well have decided the
ultimate fact of appellant's guilt from the surrounding
circumstances, and the further proof that appellant had
been seen more than once going to and from the "dug-
out," located on his farm, and he had been seen only a
few hours before the opening of the "dugout" carrying
a whiskey distillery from the direction of the "dugout"
to a place of hiding close by.   In view of these facts and
circumstances there was no need of evidence of barrels,
tubs, buckets, etc., housed in the "dugout." This latter
evidence was the only proof disclosed by means of the
search warrant.   Let it be excluded, plenty remains. The
guilt of appellant is so manifest, so indubitable from the
competent evidence, that I cannot assent to his discharge.
The sufficiency of the evidence, independent of the search,
was sufficient to sustain the verdict of the jury.   I am
fully convinced that the trial court made no error in sub-
mitting the case to the jury and in overruling the motion
and grounds of appellant for new trial, based on the in-
sufficiency and incompetency of the evidence.

The learned dissenting opinion delivered by my col-
league, Judge McCandless, fortifies me in my belief that
the judgment should have been affirmed.   I, therefore,
dissent from the majority opinion.