### Ash v. Commonwealth.

(Decided January 20, 1922.)

### Appeal from Henderson Circuit Court.

1. Searches and Seizures—Search Warrant.—Under section 10 of the Constitution providing that "the people shall be secure in their persons, houses, papers and possessions from unreasonable search and seizure, and no warrant shall issue to search a place or seize a person or thing without describing it as nearly as may be, nor without probable cause supported by oath or affirmation," it is unlawful for an officer to search the premises or seize or search other things of a suspected offender, unless the officer has a search warrant authorizing it.

2. Searches and Seizures—Search of Person or Baggage.—Subject to the exception that an arresting officer has the right to search the person of a prisoner lawfully arrested, and take from his possession property connected with the offense, or any weapon or thing that might enable the prisoner to escape or do violence, it is as great a violation of the Constitution for an officer to search a person or baggage carried about by him, without a warrant authorizing it, as it is to search his premises.

3. Searches and Seizures—Search Warrant.—No search of the person or seizure and search of personal baggage or personal belongings, or seizure of the articles found thereon or therein, can be made without a search warrant unless and until the offender has first been taken into custody, under a lawful arrest.

4. Searches and Seizures—Search Warrants.—If an officer sees an article or implement, that it is unlawful to have possession of in the possession of any person, or in felony cases, when the officer has reasonable grounds for believing that the person has committed a felony, he may without a warrant of arrest make the arrest and take possession of the unlawful things on the person arrested, but he has no lawful right to search on suspicion, either the person or baggage or personal belongings of a suspected person.

5. Searches and Seizures—Evidence.—Evidence obtained by an officer in making an unlawful search is incompetent, and objection to its introduction may be made when it is offered to be introduced in the trial.

6. Searches and Seizures—Search Warrant.—The seizures and searches which the provision of the Constitution forbids without a search warrant, legally issued, are not confined to those made in the presence of the accused or owner, but include those made in his absence without his consent when the thing searched or seized is constructively in his possession, therefore, it was unlawful for officers to seize and search a suit case or grip belonging to one who had placed it in a passenger depot, but who was not corporeally present when they were seized.

F. J. PENTECOST and J. H. HART for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant, Buster Ash, was tried and convicted in the Henderson circuit court under an indictment accusing him ''of the offense of unlawfully keeping for sale and transporting spirituous and vinous intoxicating liquors for other than sacramental, medicinal, scientific or mechanical purposes, committed in manner and form as follows:'' The accusatory part of the indictment alleges that he ''did unlawfully keep for sale and transport spirituous and vinous intoxicating liquors for other than sacramental, medicinal, scientific or mechanical purposes, against the peace and dignity of the Commonwealth of Kentucky.'' The indictment was bad for duplicity in that it accused the defendant of the two offenses of keeping for sale such intoxicating liquors and also of transporting them. However, there was neither a motion by defendant for the Commonwealth to elect the offense for which it would try him, nor was there a demurrer to the indictment and so far as the trial under review is concerned the duplicity in the indictment was waived.

This appeal by defendant calls in question the competency of the evidence upon which his conviction was had, since it is strenuously insisted by his counsel that the evidence introduced by the Commonwealth, which was all that was heard upon the trial, violated the provisions of section 10, of our Constitution, which says: ''The people shall be secure in their persons, houses, papers and possessions from unreasonable search and seizure; and no warrant shall issue to search any place, or seize any person or thing, without describing them as nearly as may be, nor without probable cause supported by oath or affirmation.''

The Commonwealth introduced at the trial three policemen of the city of Henderson, who were Ed Bagby, D. A. Howard and Phil Jones. Their testimony, as contained in the transcript, is in narrative form, and that of the witness Bagby, as presented to us, is: "That he is a policeman for the city of Henderson, and on the night in question, he not being the regular officer on the beat at the Union station, went to the station between fifteen and thirty minutes before the train time, that while he was there he saw a grip or suit case sitting under a seat in the colored waiting room, and in a few minutes he saw the defendant, Buster Ash, go in and set a grip down beside said suit case, that he immediately called upon officers Howard and Jones to watch said suit cases while he shadowed the defendant; there being two doors or two entrances to the depot, one from the street and one to the train, witness went around the depot to one of these doors, but missed the defendant who evidently went out the other. The train came in about fifteen minutes after that, and after the train had come and gone, the three officers continued to watch the grips for about fifteen minutes longer, but neither the defendant or any other person came to claim one of the grips or suit cases; whereupon the witness and officer, Howard, took the two suit cases in the city patrol car from the depot to the police station where they opened them and found in them several quarts of white liquid, which looked and smelled like liquor or white whiskey; witness did not say he tasted it; that at the time of recovering the suit case no warrant had been issued for the defendant, nor had any search warrant been issued authorizing the seizure of the defendant, or the search of any papers, baggage or belongings of his, that in fact, no warrant was issued at the time, but about a week later witness met the defendant on the street and took him to headquarters where he read a warrant to him that had been prepared since the seizure of the suit case at the depot, charging the same offense set out in the indictment, at which time defendant denied ownership of the suit case." The other two witnesses corroborated him with the additional statement by Howard that he tasted the liquid referred to by Bagby and that it was intoxicating, and Jones knew nothing of what occurred at the police station, to which place the grip and suit case were removed from the depot. It will be observed that the testimony does not make it clear as to

whether the liquor was found in the suit case, or in the grip, or in both. Evidently if it was found only in the suit case there would be no evidence upon which the conviction could be sustained, waiving all questions of competency, for in that case the guilty contents would come from a receptacle with which, according to the proof, the defendant had no connection, it not being shown that he either owned, or that he had ever had it in his possession. On the contrary, according to the witness Bagby, he denied ownership of it.

But, waiving that question, and proceeding directly to the determination of the constitutional one presented, we are clearly of the opinion that in the introduction of the testimony of the officers the constitutional protection was violated and, under the doctrine of the case of Youman v. Commonwealth, 189 Ky. 152, 224 Southwestern Reporter 860, and 13 A. L. R. 1303, a peremptory instruction to acquit defendant should have been given. It was held in that case that "the section does not permit any kind or character of search of houses, papers, or possessions without a search warrant," and that "this constitutional provision, which is broad enough to, and does, include every article and species of property, was intended to afford the individual, however humble he may be, protection and security against any unlawful invasion of his premises or possessions" by any officer assuming to act under color of his office and that neither he nor any one else had the right to search any of the property included within the constitutional provision on suspicion but only under a legally issued search warrant, or without such warrant to search anything found thereon "such as boxes, barrels, drawers, closets or other places, in which articles of property of any kind may have been placed by the owner," although "there may be reasonable grounds to believe that he is guilty of the charge preferred against him, or the offense of which he is suspected." It was further held that the constitutional protection extended to and included *baggage* carried about by the accused and that a seizure of or search of his baggage without the necessary search warrant was as much unauthorized as a similar search of his residence or houses. Furthermore, it was therein held, following numerous opinions upon the subject, that evidence obtained by the unlawful seizure or search could not be introduced against the accused, nor could a conviction be sustained thereon. We

may add that the fact that the seized baggage in this case was not at the time it was taken in the corporeal possession of the defendant cannot militate against the wrongfulness of the seizure, since it was in his constructive possession, which is sufficient.

In the Youman case, and in the great majority of cases throughout the country in which the question was presented the forbidden seizure and search were had when the accused was physically absent. In the case referred to the search was of the residence and premises of Youman and, necessarily, if the word ''possessions'' in the constitutional provision included baggage, as we hold it does, it cannot be seized or searched in defendant's absence any more than his houses may be so searched. Besides, the object and purpose of the constitutional provision in protecting the citizen in the privacy and security of his ''papers and possessions'' would be defeated altogether unless his baggage or other receptacles in which such papers or possessions are carried, though only constructively in the possession of the owner, were included in the constitutional guaranty.

It is doubtful if our boasted constitutional form of government affords any greater single protection or bulwark to American liberty than the one against unreasonable search and seizure, forbidding either without a warrant legally issued, authorizing it to be done, An examination of the authorities, subsequently referred to, will clearly demonstrate that the legislature itself is not the sole judge of the reasonableness of the search and seizure for which it may authorize a warrant, but it is quite universally and rightfully held that the enforcement of prohibition statutes against the sale, manufacture, etc., of intoxicating liquor affords an instance where the issual of such warrants may be authorized. (24 R. C. L. 716.) But, even in that case, the affidavit or affidavits upon which the warrants are issued must contain more that the bare suspicion of the affiants. Of course, if the accused should be arrested pursuant to any of the methods legally authorizing it, any article of a criminatory nature found upon or about his person or in his immediate presence will be competent evidence against him, though discovered without a search warrant. And, likewise may such evidence be introduced if developed by a search to which the accused consented, or which was consented to by the one lawfully in possession

of the thing searched; and this is the extent only of the doctrine of the cases of Turner v. Commonwealth, 191 Ky. 825; Commonwealth v. Riley, 192 Ky. 153, and Banks v. Commonwealth, 190 Ky. 330, cited by counsel for the Commonwealth.

A complete history of the conditions which brought about the insertion in our Federal Constitution and in most, if not all, of the Constitutions of the various states, the protecting provisions against unlawful seizures and searches is found in Cooley's Constitutional Limitations, seventh edition, pages 424-434, inclusive. It is there shown, as it is also done in the case of State v. Marxhausen, 3 A. L. R. 1505, that prior to our revolution a practice had grown up in England for the courts to issue what might be termed blanket warrants or orders authorizing the officer into whose hands the process went to search persons, houses and possessions in order to obtain evidence of the commission of a crime and to arrest the person whom the evidence indicated had committed it. Such practice and conduct, as well as high-handed procedure, was so inimical to the Anglo-Saxon notion of liberty that the judges of the higher courts of that country began to denounce the practice as revolutionary and tyrannical, and Lord Camden, in the case of Entinck v. Carrington, 19 Howard St. Tr. 1209, said: "To enter a man's house, by virtue of a nameless warrant, in order to procure the evidence is worse than the Spanish Inquisition—a law under which no Englishman would wish to live an hour." See also May's Constitutional History of England, chapter 11.

Similar unauthorized seizures and searches had commenced to be indulged in by the American Colonies, and at a trial had in Boston, Mass., in February 1761, James Otis, a celebrated lawyer of that day and a native of Massachusetts, was Advocate General of the Crown at Boston. He declined to prosecute the persons arrested under such unauthorized warrants and resigned his office and tendered his services to the defendants without remuneration, though offered a large fee, saying, "In such a case as this I despise a fee." His argument in the case will be found in the Life and Works of John Adams, vol. II, page 523, and in it he denounced such practices and such writs as "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law that ever was found in an

English law book," and that they placed "the liberty of every man in the hands of every petty officer." John Adams afterwards, on March 29, 1817, wrote a letter to a friend in the course of which he said concerning the speech of Mr. Otis that "then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." Amid such agitations and opposition to such arbitrary conduct the United States of America was formed and the fourth amendment to the Constitution was adopted, which says: "The rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Since that provision was a limitation only upon the federal authorities the respective states adopted similar provisions in their constitutions for the protection of their citizens against arbitrary power exercised by the state, ours being the one herein-before inserted.

Justice Bradley, of the Supreme Court of the United States, in the case of Boyd v. United States, 116 U. S. 616, in referring to the opinion of Lord Camden, supra, said: "The law as expounded by him has been regarded as settled from that time to this, and his great judgment on that occasion is considered as one of the landmarks of English liberty. It was welcomed and applauded by the lovers of liberty in the colonies, as well as in the mother country." A short while after the rendition of the Entinck opinion, and in 1766, the English House of Commons passed resolutions condemnatory of the grown-up practices concerning searches and seizures, and during the discussion of the resolutions Lord Chatham said: "Every man's house is called his castle. Why? Because it is surrounded by a moat, or defended by a wall? No. It may be a straw-built hut, the wind may whistle around it, the rain may enter it, but the King cannot." The interpretation given to our constitutional provision extends the same sacred protection to one's "papers and possessions" as it does to his person or his houses, and it will indeed be a sad day when misguided innovators may succeed in destroying it. Shortsighted statesmanship, in order to serve immediate purposes, sometimes place the end to be accomplished above the

means employed, although the "means" might involve
the setting aside and a virtual repeal of a sacred princi-
ple of constitutional liberty. The inevitable result of
such a course, as is fully borne out by the world's history,
is ultimate disintegration and destruction of the govern-
ment. It is therefore everywhere conceded that it is "the
duty of the courts to denounce as unlawful every unrea-
sonable search and seizure, whether confessedly without
any color of authority, or sought to be justified under the
guise of legislative action." 24 R. C. L. 704, and many
cases in the notes.

In the Marxhausen case, *supra,* the officers had no
search warrant and they made the seizure and search
therein complained of upon no higher authority than bare
suspicion. In denouncing their conduct, the court said:
"They entered the home of defendant by command of no
court; they searched his premises by virtue of no process.
They justify, if at all, under administrative will and man-
date, not recognized by the Constitution and unauthorized
in a government of law. That 'the end justifies the
means' is a doctrine that has not found lodgment in the
archives of this court. The search and seizure detailed
in this record was an unauthorized trespass and an in-
vasion of the constitutional rights of this defendant." It
is true the search there involved was of a house, but
as we have seen our constitutional provision includes
baggage (as within the term "possessions"), as well as
houses.

The Youman case, as we have seen, is also reported in
13 A. L. R., page 1303. Just in front of that case, as re-
ported in the volume referred to, are a number of others
from other states, dealing with the question of unlawful
seizure and search as contained in the constitutions of
those respective states, and beginning on page 1316, at
the end of the Youman opinion, is an extended annota-
tion which is supplementary to another one found in 3
A. L. R., 1514, which itself follows a number of other re-
ported cases upon the subject. In those annotations and
cases the subject is exhaustively discussed in all its
phases, and we will not tax the reader or lengthen this
opinion by incorporating excerpts therefrom, but content
ourselves with only referring thereto, with the statement
that the principles hereinabove announced are thoroughly
substantiated therein, and a reading of which will induce
the conviction that the courts of the various states where-
in the constitutional provision under consideration, or

a similar one, exists, feel it to be their duty to allow no encroachment thereon, and to say of those otherwise disposed what was said by the French of the Germans at the battle of Verdun, "They shall not pass," since the prevention of the advancement of the Germans at that battle was no more essential to the preservation of the liberties of France, in our humble opinion, than is the prevention of the encroachment upon the constitutional provision under consideration essential to the continued perpetuity of our constitutional liberty. The destructive consequences might sooner occur in the one case than in the other, but none the less certain.

It, therefore, results that all evidence heard upon the trial of appellant was incompetent and the court should have instructed the jury to find him not guilty. Wherefore, the judgment is reversed with directions to grant the motion for a new trial and for proceedings consistent herewith.