## Jones v. Commonwealth.
## Hightower v. Same.
(Decided April 21, 1933.)

504

B. B. GOLDEN and J. M. ROBSION for appellants.

BAILEY P. WOOTTON, Attorney General, FRANCIS M. BURKE, Assistant Attorney General, and JOSEPH B. SNYDER for appellee.

OPINION OF THE COURT BY HOBSON, COMMISSIONER— Affirming.

W. H. Hightower, W. B. Jones, and a number of others were indicted in Harlan county for the murder of James Daniels, and it was charged in the indictment that they willfully and feloniously, and with malice aforethought, entered into a conspiracy with each other

and other persons, to the grand jury unknown, to murder James Daniels and other persons, to the grand jury unknown, and that, as a result of the conspiracy, and pursuant to it, one or more of the defendants or other persons acting with them, in furtherance of the conspiracy and while same existed, did shoot, wound, and kill Daniels.

The case was, by a change of venue, transferred to Montgomery county. Jones was placed on trial. The jury found him guilty, and fixed his punishment at life imprisonment. Hightower was tried separately. The jury in his case returned a like verdict. Each has appealed to this court, and the two appeals have been heard together, as they turn on like facts.

Briefly stated, the facts are these: Harlan county has a large coal business, which in January, 1931, was much depressed. By reason of this the coal companies operated from two to four days a week, and the miners attempted to unionize the mines. The mine owners did not want the mines unionized. In the latter part of February, 1931, the miners attempted to organize the Union Mine Workers, and various meetings were held for this purpose in March. Fifty-three miners attended the first meeting, but the number soon grew to five hundred present. Jones was elected secretary of the Evarts local union and Hightower president. There was only one local of the union in Harlan county, and this was the Evarts local; all miners who joined the union becoming members of the Evarts local. The principal meetings were held at Evarts between March 15 and May 4, and between these dates a large number of unemployed miners moved into Evarts. Jones lived in Evarts, maintaining the office of the union in one room of his house. The members of the union met daily in and about this office. Many of those attending were armed, and Jones had several high-power rifles and much ammunition in his office. Guns were carried to and from the office, and about two or three weeks before Daniels was killed Jones was seen to give two of the men guns. The sheriff had appointed a number of deputies whose duty it was to keep peace at the mines. Much bitter feeling arose between the miners and these deputies, as the miners insisted they were acting unfairly and not treating them right. On the night of May 4 a meeting of the union was held at the Evarts

theater, at which only members of the union were admitted. Three or four hundred members were present. A committee was appointed to advise the sheriff of the county as to the action of the deputies and demand that they be stopped from imposing upon the people. Another committee was appointed, as shown by the proof for the commonwealth, to go to Straight Creek in Bell county and get some guns, and a collection was taken up to hire a car to make the trip. James Daniels was one of the deputy sheriffs; E. R. Childers was superintendent of the mine; and at this meeting Jones said "Jim Daniels and Childers and the law will be up here in the morning and they will be going to Harlan. Don't shoot at their bodies, but shoot at their heads." He advised them to be on the street the next morning with their guns and bring a red flag if they did not have a gun. Hightower said, "Follow your leader and keep this shut (putting his hand to his mouth). Hear nothing, see nothing and know nothing." On the next morning May 5, as early as 7 o'clock, armed men were traveling the highway going into Evarts, and many of them were seen on the bridge and about the depot with shotguns, rifles, and pistols. These armed men, numbering from one to three hundred, as estimated by the citizens, were behind trees, railroad cars, cross-ties, and other objects. Ten officers came along in three automobiles, and had just passed the railroad crossing when they were fired upon from all directions. Three of the officers, James Daniels, Otto Lee, and Howard Jones, were killed, and several others were wounded. The evidence for the commonwealth was that the shooting began from the miners before the automobiles, in which the officers were riding, stopped or any shooting was done by them.

On the other hand, the proof for the defendants was that Daniels fired the first shot. A thousand or more shots were fired. The shooting continued for fifteen or twenty minutes.

The appellants introduced a large mass of testimony contradicting the proof for the commonwealth on all the material facts and showing that they advised the men to maintain order and do nothing to disturb the peace; that they took no part in the arming of the men; had no part in the shooting, and knew nothing of it until it was over; that the collection that night was taken up for the benefit of the poor, and they knew

nothing of the car being sent for the guns or preparation or plans for the gathering of the men the next morning, armed, about the depot for hostile purposes.

It is earnestly insisted that the verdict of the jury should be set aside under the evidence. But the well-settled rule is that the credibility of the witnesses is for the jury. The proof by the commonwealth, if believed by the jury, fully warranted the verdict. For it showed that appellants were the leading spirits in the Miner's Union, and that they advised violence, sent for the guns, furnished the ammunition, and in more ways than one advised the killing of the officers for the purpose of carrying out the plans of the Miner's Union and to prevent the officers from obstructing them in their plans.

The following grounds for a reversal are relied on:

1. Judge Jones, the regular judge of the Harlan circuit court, refused to vacate the bench after appellants had filed affidavits stating that he would not give them a fair trial. It is unnecessary to pass on the sufficiency of these affidavits. The motion was not made when the defendants were brought into court and entered their pleas of not guilty, but on a subsequent day of the term. The rule is well settled that "the objection to the judge must be made, to be available, before an appearance to the merits of the case." Massie v. Com., 93 Ky. 590, 20 S. W. 704, 14 Ky. Law Rep. 564; Hargis v. Com., 135 Ky. 578, 123 S. W. 239; Tolliver v. Com., 165 Ky. 312, 176 S. W. 1190, 1193. The motion here was not made before an appearance to the merits, but, passing this, it is clear that no substantial right of the defendants was affected by this ruling of the circuit judge. He did not try the case; he only sustained the motion for a change of venue; and on the facts shown the change of venue was properly ordered. Section 340 of the Criminal Code of Practice provides that a judgment of conviction may only be reversed for an error of law "when, upon consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby." Clearly no substantial right of the defendant was prejudiced by the refusal of the judge to vacate the bench. The case was tried before another judge and in another circuit.

2. It was also insisted that the circuit court erred in changing the venue to Montgomery county, but the

record very clearly shows that the same conditions practically existed in the counties adjoining Harlan, and that there would be the same difficulty in obtaining a jury in any of these counties as in Harlan county, by reason of the fact that the mine troubles existed there no less than in Harlan and the same prejudices had been aroused there as in Harlan. The record does not show any ground of objection to Montgomery county or any reason why a fair trial could not be had there. It does not appear that the defendants were unable to get before that court any witnesses they had, and in fact they introduced over seventy witnesses on the trial of the case, and the real facts of the controversy were as fully brought out there as they could have been in any other county nearer Harlan than Montgomery. Very clearly no substantial right of the defendant was affected under the proof by the change of venue to Montgomery county.

3. On the trial the court admitted the evidence that Charlie Carpenter was publicly whipped in a union meeting over which Jones presided about two weeks before the homicide. This is complained of; but in conspiracy cases the evidence is permitted to take a wide range. Alsbrook v. Com., 243 Ky. 814, 50 S. W. (2d) 22. Carpenter had been a member of the union but had left it. Jesse Pace was killed in front of Jones' house while he was attempting to arrest those charged with whipping Carpenter. The members of the union were opposing the efforts of the officers to maintain order, and Jones and others demanded the removal of the sheriff and other officers. What happened in Carpenter's case was simply the prelude of what followed, and resulted in the homicide for which appellants were tried. The evidence was admissible, for it formed a link in the chain of evidence showing the unlawful acts and conduct of the appellants, and the purpose they had in view.

4. When the appellant Hightower was arrested, the officers found in his possession a drawing showing the battle between the officers and the members of the union in which Daniels and others were killed. This drawing was admitted in evidence on the trial of Jones on the assurance of counsel for the commonwealth that they would later make it competent as to Jones. When they failed to do this, the court excluded the evidence

as to Jones, and told the jury not to consider it. The paper was competent against Hightower in whose possession it was found. On it the officers were referred to as "Blair's gun thugs," and showed that the drawer of it was not on the side of the officers, but on the side of the persons making the attack. In Ash v. Com., 193 Ky. 452, 236 S. W. 1032 it was held that any article of a criminatory nature found upon the person of the defendant, when arrested, is competent evidence against him. The photographs of the scene of the fight were properly admitted in evidence upon the testimony of the photographer. Cook v. Com., 240 Ky. 766, 43 S. W. (2d) 1, and cases cited.

5. The exceptions to the testimony of Vina Hatfield were properly overruled. She lived just across the river from the shooting, and could see and hear what was going on over there. A few minutes after the shooting two men waded across the river and came to her house with their clothes wet, each having a gun. It might have been five minutes or ten minutes after the shooting, she says. They left the guns at her house. Their actions and conduct showed that they had taken part in the shooting, and this evidence was properly admitted as a part of the res gestæ. In cases of this sort no definite or fixed limit of time can be established as a general rule to determine what shall be a part of the res gestæ. Each case must depend upon its own circumstances. McCandless v. Com., 170 Ky. 301, 185 S. W. 1100; Karsner v. Com., 235 Ky. 710, 32 S. W. (2d) 43; Robertson's New Criminal Law, sec. 1788.

6. The same rule applies to the testimony of Helen Kelley, who lived near Jones, who testified that a few minutes after the shooting a man came by her house going towards Jones' house to get ammunition. This was so close to the shooting as to be regarded as res gestæ. There was other proof showing that ammunition was kept at Jones' house and gotten from it by the miners.

7. Roscoe Hickey lived about three miles from the depot. He passed by in a truck on the morning of the homicide and not very long before the shooting. He saw fifteen or twenty men there armed with guns. This was so close to the shooting as to show the preparation for it and was properly admitted; for the officers had not come at this time.

8. The same rule applies to the testimony of Orville Howard, who was the station agent at Harlan. He got to his office about 6 a. m. There were a number of men there then. The crowd gradually increased until train time, about 7:40. They were armed with guns, and were fifty or sixty in number. This evidence was competent as showing preparation for what followed.

9. Dr. E. M. Howard, who examined the body of Daniels after the shooting, testified as to the wounds on the body. This evidence was properly admitted, and there was nothing in it prejudicial to the substantial rights of the appellants. The same is true of the testimony of J. H. Blair, the sheriff, whose deputy Daniels was.

10. E. B. Childers stated facts showing what led up to the occurrences of May 5, and in cases of this sort necessarily a wide range is permitted; for a public sentiment is not created at once, and it took time to develop among these miners a determination to do what was done on May 5. The material thing in such cases is the intent of the parties, and this may be shown by the previous actions leading up to the final act.

11. The testimony of Henry Cook, who attended the union meeting at the Blue Front Garage, was properly admitted; for this meeting led to the meeting on May 4, when, according to the proof for the commonwealth, the plans laid at the former meeting were more distinctly provided for. At this meeting plans were laid to take Jim Daniels and Childers out and kill them. The meeting on May 4 at the theater was merely the sequence of the prior meeting.

12. The court properly refused to admit the testimony of F. J. Jones as to what John Lester stated to him, which was offered to contradict Lester. Jones, being the attorney of Lester, could not properly testify as to any communication his client made to him.

13. The proof that the store had been broken into was properly admitted to explain why there were guards around the store. This evidence threw no light upon the homicide, and could not possibly have been prejudicial to the appellants.

14. The miners who had left the service of the company and organized the Miner's Union, among other

things, complained that the air in the mine was bad, and some proof was given that the air was all right. But this clearly was not prejudicial to the appellants in any way. It threw no light upon the homicide.

A great many other rulings of the court on the evidence are complained of in the briefs for appellants. But they all rest upon the same grounds as those above noticed, and none of them affects the substantial rights of the appellants upon the whole case.

15. There was evidence on behalf of the defendants that James Daniels fired the first shot, and it is earnestly insisted that an instruction on self-defense should have been given on behalf of the defendants. But they were not present at the homicide; they did none of the shooting. They were only responsible for what occurred there if the shooting was done pursuant to a conspiracy to which they were parties. The officers as they passed in the car were going along on a peaceful mission. When they reached the depot, two or three hundred men armed with guns were there. It may be that the first shots were fired very close together, but which was fired first was not very material, for it is clearly shown by the evidence that these men had gathered there with their guns for the purpose of stopping the officers and shooting them. They had gone there for a hostile purpose. Their presence, with their guns, when they had assembled for such a purpose, placed the officers in danger when the officers arrived on the scene. The rule is well settled that he who brings on a difficulty may not plead self-defense. The man who seeks his adversary for the purpose of shooting him cannot be acquitted on the ground of self-defense if, when he finds his adversary, the adversary is quicker than he and makes the first shot. For the man who is hunted up by another when he finds himself in danger may take such steps as in his reasonable judgment are necessary for his protection. There is no doubt here that these men were there for the purpose of shooting the officers and had armed themselves for this purpose. They would not be entitled to a plea of self-defense if one of those who did the shooting had been indicted here, and appellants are in no better shape than they would have been.

16. Complaint is made of the argument of the commonwealth attorney in his closing speech. But what he

said was largely in response to what appellant's attorneys had said, and, taken as a whole, clearly was not prejudicial to any substantial right of the appellants.

The record of the trials takes up about five thousand pages of typewritten matter. The trials each took many days. The learned circuit judge, who presided with impartiality, ruled clearly and consistently throughout the trial on all the matters involved. The testimony of all the witnesses for the defendants who were absent was read to the jury from the affidavit for a continuance, which was taken as their deposition. The cases were tried before juries removed from all local influences, and no reason is shown why a fair trial might not be had in Montgomery county. On the whole case, the court concludes that there was on the trial of these cases no error prejudicial to the substantial rights of the appellants, and that the judgments cannot be disturbed.

Judgment affirmed.

The whole court sitting.