## Hudson v. Commonwealth.

(Decided June 20, 1933.)

846

B. B. GOLDEN, J. G. FORESTER, DANIEL BOONE SMITH and J. M. ROBSION for appellant.

BAILEY P. WOOTTON, Attorney General, and FRANCIS M. BURKE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Affirming.

Bill Hudson was jointly indicted with William Hightower, W. B. Jones, Jim Reynolds, and a number of others for the murder of Jim Daniels, a deputy sheriff of Harlan county. The indictment charged that the murder was committed pursuant to and in furtherance of a conspiracy entered into between defendants. On separate trial Hudson was found guilty, and his punishment fixed at imprisonment for life. By this appeal he is seeking to reverse the lower court's judgment, and as grounds warranting such action it is argued by his counsel in brief that the lower court erred in admitting incompetent and prejudicial evidence and in instructing the jury.

Hightower, Jones, and Reynolds have heretofore been convicted of the crime charged in the indictment; and, on appeal, the judgments were affirmed. See W. B. Jones v. Commonwealth (William Hightower v. Com-

monwealth) 249 Ky. 502, 60 S. W. (2d) 991, decided April 21, 1933, and Jim Reynolds v. Commonwealth, 249 Ky. 502, 60 S. W. (2d) 991, decided May 30, 1933. A detailed statement of the tragedy and the facts and circumstances leading up to it will be found in those opinions. We shall therefore confine ourselves to a brief summary of such facts as are necessary to an understanding of the questions presented and refer to those opinions for more comprehensive statements.

Harlan county is one of the largest coal-producing counties in the state, and thousands are engaged in that industry. Prior to 1931 there had been little, if any, attempt to unionize the miners, but, owing to general business depression, necessitating large curtailment in production and to other conditions unsatisfactory to the miners, an attempt was made in that year to organize a mine worker's union. Mine owners and operators were not in sympathy with this movement. The effort to organize started in February, and thereafter and up to and including May 4 a number of meetings were held. The attendance at the first meetings was small, but at some of the later meetings 500 or more were present. Some of the meetings were open to the public; others closed to all except members who were admitted by card. According to the evidence for the commonwealth, the leaders in the movement and other agitators made inflammatory speeches to assembled miners in which they advised and encouraged violence especially toward officers of the law.

On May 4, the night before Daniels was killed, a closed meeting attended by several hundred members of the union was held at the Evarts theater. At this meeting Jones, who was one of the promoters of the organization and secretary of the local union at Evarts, made a speech asking members to be on the streets the next morning with guns, as Daniels and the others officers would be going through on their way to Harlan. On the following morning a large number of miners armed with high-powered rifles, shotguns, and pistols assembled in or near Evarts. Shortly after crossing over the bridge on the road leading out of Evarts, the three automobiles in which Daniels and those accompanying him were riding were fired upon by this armed throng; the officers returned the fire, and in the battle which raged for 20 or 30 minutes, and in which hun-

dreds of shots were fired, Daniels and two or three others were killed and a number wounded.

As to appellant, the evidence tends to establish that he attended some of the meetings and was present at the one held on the night of May 4. Early the following morning, he advised a neighbor to keep his children at home that day, because there was going to be trouble. A short time before the shooting, he was seen near the place where it occurred, and one witness positively identified him as one of those present and engaged in shooting at Daniels and other officers. It is further in evidence that during the fight he was seen running toward the home of Jones and heard to say that he had been sent there to get more ammunition. About the time of the shooting, he was again seen going from the scene of the difficulty and again heard to make some remarks about the shooting. The evidence for appellant is to the effect that Daniels first opened fire and brought on the difficulty resulting in his death. Appellant denied that he attended the meeting held at the Evarts theater on the night of May 4 or that he ever had any part in a conspiracy to kill Daniels or that he was present at the time he was killed. In this he is corroborated by a number of other witnesses.

In the list of points and authorities attached to the brief prepared by counsel for appellant is found reference to a number of alleged errors not discussed in the body of the brief. This list appears to be a carbon copy, and, as we gather from the statement of counsel, is the same as attached to briefs in other cases. We note that some of the things complained of in this list of points and authorities do not appear in the record on this appeal, and those not discussed in the body of the brief have been determined adverse to appellants in opinions in the Hightower and Jones and the Reynolds Cases.

It is first argued that the court committed reversible error in permitting a number of witnesses to testify about the killing of one Lee and others and to go into detail in describing the nature and character of wounds of some who were not killed. This court, in disposing of a similar contention in the case of Reynolds v. Commonwealth, supra, said:

"The evidence respecting the death and injuries of other officers accompanying the deceased, Daniels,

was competent also as res gestæ. Those results were so intermingled with the killing of Daniels as to be inseparable. The case could not have been related without this evidence, and it was necessary and competent. Jordan v. Commonwealth, 240 Ky. 391, 42 S. W. (2d) 509; Gaines v. Commonwealth, 242 Ky. 237, 46 S. W. (2d) 75.''

John Hickey testified as to unemployed miners moving into Evarts and loafing about on the streets. Roy Hughes testified as to a conversation he had with a man by the name of Dykes a week or so before the killing in which Dykes made threats against him. J. H. Blair and others were permitted to testify as to speeches made by W. B. Jones and Gill Green, a colored preacher, in the courthouse in Harlan. Bascom Carter testified with respect to alleged trial of Harold Gibson at one of the union meetings on a charge of ''snitching,'' which as explained in the record meant giving out information as to what occurred at the meetings.

It is earnestly argued that all this evidence was incompetent and highly prejudicial to appellant; however, as pointed out in the opinions in the other cases to which we have referred, the evidence to establish a conspiracy must necessarily take a wide range; and a consideration of the statements of these witnesses of which complaint is made in connection with all their evidence and the evidence of other witnesses leads unerringly to the conclusion that it was competent and admissible as bearing on the question of a conspiracy and of its general plan and purpose to prevent Daniels and other peace officers from discharging their duties and to secure their removal by violence and otherwise.

It is also asserted that the court erred in permitting Sevilla Roark to testify that after the shooting she heard a man say, ''Didn't a union man have a scratch.'' The evidence discloses that this conversation occurred at the home of Mrs. Helen Kelly. Mrs. Kelly had previously testified that appellant came to her house about the time the shooting was over and said:

''Not a union man got a scratch. One of the thugs got away and got into the hills. There is a crowd of them in there after him now. They are out of ammunition over there. They sent me to Bill Jones' to get some cartridges. We are going to bring him out too.''

Coupled with the evidence of Mrs. Kelly and the fact that the man whom Sevilla Roark heard make the statement was coming with others from the scene of the shooting, it is at once apparent that there is no merit in the contention that the evidence of this witness was incompetent.

Complaint is made of evidence of Caywood Burton, who testified that he was at the home of his mother, Vina Hatfield, near the scene of the shooting, and that, after the shooting, Doyle Assid and Roscoe Dameron came to the home of his mother and left two guns. In the Hightower and Jones Case, this court held the evidence of Vina Hatfield that these guns were brought to her home to be competent, but, aside from any question of competency, this evidence was not prejudicial, since the uncontradicted evidence shows that there were hundreds of armed men in and around Evarts and guns were kept or stored at various places.

Other evidence as to statements and acts occurring both before and after the killing of Daniels is called in question. Without going into detail, it may be said that this evidence as to matters occurring before the killing was competent as bearing on the question of conspiracy, and we are not impressed with argument that evidence as to acts or statements occurring after the killing was prejudicial. The error, if any, in its admission was cured by the court's instruction that no acts or declarations done or said after the death of James Daniels, by any one or more of appellant's alleged coconspirators should be considered by the jury, unless appellant was present when such declarations were made or acts done. The court gave the usual and often approved form of instruction respecting the evidence of an accomplice, and the instructions otherwise are practically the same as given in the other cases and approved by this court in the opinions to which reference has heretofore been made.

Since the record discloses no error prejudicial to appellant's substantial rights, the judgment is affirmed.

Whole court sitting.