## Cole v. Commonwealth.

(Decided Oct. 4, 1935.)

555

FLEM D. SAMPSON for appellant.

BAILEY P. WOOTTON, Attorney General, and WM. A. SHU-MATE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At about 10 a. m. on December 15, 1933, the appellant and defendant below, Ed Cole, shot and killed his uncle, Dexter Cole, in a private country road passing in front of the residence of Nathan Johnson, who resided on Cole's branch of Stinking creek in Knox county. He was later indicted, charged with murder, and at his trial he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for ten years. On this appeal by him from the verdict and the judgment pronounced thereon a number of grounds are argued as constituting reversible errors, but which do not embrace all of those contained in the motion for a new trial; the others thereby becoming abandoned.

The grounds so urged in brief of learned counsel are: (1) Error of the court in permitting evidence of another crime which was a misdemeanor; (2) error of the court in stopping further cross-examination of commonwealth's witness resulting, as contended, in defendant failing to elicit the truth as to what happened at the time of the shooting; (3) error in admitting the introduction of the clothing of the deceased; (4) error in

two of the instructions given the jury; and (5) improper remarks of prosecuting counsel in the argument of the case. Preliminary to taking up any of them for determination, it is deemed proper to make a brief statement of the testimony, and particularly that relating to what happened at the immediate time and place of the shooting.

Although the relationship of uncle and nephew existed between the deceased and the defendant, there was not such a great difference in their ages; the former being about 37 years old and the latter about 23 years. Each of them was married and lived in the same neighborhood. Some time shortly before the homicide defendant shot and killed a dog belonging to deceased, and it was also developed that prior to the homicide the deceased had been more or less active in trying to suppress the illicit manufacture and sale of liquor on the branch or creek upon which each resided, and had been somewhat officious in his efforts in that direction, resulting, in part, in the obtention of a search warrant whereby defendant's premises were searched; and, as we gather from the record, the searching of defendant's premises occurred before his killing the dog of deceased. But, however that may be, there was testimony introduced by the commonwealth proving a threat by defendant against deceased to the effect that the uncle might receive the same treatment at his hands as he had administered to his dog.

On the morning of the killing, deceased started from his home walking along the neighborhood road with the intention of going to the home of a Mr. Combs, and which carried him past several residences one of which was that of Nathan Johnson. Sometimes the country road (and especially after heavy rains) became difficult to travel and pedestrians using it would detour through or over adjoining fields, and it appears that after the bad feeling had become engendered between the two there was considerable talk by each of them as to whether or not the one would permit the other to engage in making such detours over the adjoining land of the other. When deceased reached the residence of Nathan Johnson, they engaged in a conversation while leaning against the fence in front of the house and near the road. In the neighborhood of 10 o'clock they saw

defendant approaching traveling in the same direction that deceased was going and, as he stated, on a mission of going to his postoffice located further along. The commonwealth's witness Nathan Johnson, besides farming to some extent, is a Christian minister, and has been for some fifteen years. No one witnessed the shooting but him, the deceased, and the defendant, and of course after the latter's death there remained as eyewitnesses only the other two. Johnson testified that when he saw defendant approaching along the road he was walking "very fast" with his right hand in his trouser pocket, when the deceased said, "Ed, wait, I want to talk awhile," when defendant said, "All right." They were then some 25 or 30 feet apart and deceased started toward the road so as to get nearer to the defendant, who was also closing the distance between them by continuing his traveling in the road, and said: "Ed you ordered me out of your field, if you will let me come through when it is muddy there [then] you all go on through, if you don't think it is fair for you to go through mine and me not through yours." Ed replied: "I am going to town tomorrow and I am going through your field but you can't go through there." Whereupon deceased turned and asked witness "if a rule that won't work both ways wasn't no count," and then said to defendant, "If you don't agree to let me come through your field I don't aim to let you go through mine"; that deceased then said to defendant, "Ed, you called me a son of a bitch then," and Ed answered, "Yes," and drew his pistol and fired at deceased, the bullet hitting him in the center of the forehead and killing him almost instantly, his body falling in the middle of the road with feet uphill.

The defendant denied practically if not all of the incriminatory testimony of Johnson, and stated that as he approached the two standing by the fence (Johnson and deceased) he heard one of them say, "There he comes," but that he did not know which one of them spoke those words; that he was then about twelve yards from them, and that deceased started towards the road with his hand in his right-hand overall pocket.

"Q. What did you do when you saw him coming if anything? A. Well, I thought that he was going to do something to me and it frightened me and I had this.

little gun and I run my hand in my pocket and started to go around him. He called to me to stop he wanted to talk to me.

"Q. What did he say? A. He said 'I told you to be damn sure that you stayed out of my premises.'"

That at that time he was approaching toward defendant with his right hand in his pocket and gesticulating with his left hand, when he (defendant) said: "Let's have no trouble. If you don't want me to go through I will go around." And that deceased replied: "You are the G—— d—— s—— of a b—— that shot my dog," and that deceased was trying to draw his knife from his pocket when defendant shot him. As the body of deceased lay in the road, his feet were some twelve inches or more higher than his head, and there was found an unopened small barlow knife just at the outer opening of the right-hand pocket of his overalls. The wife of deceased was introduced as a witness for the commonwealth and identified the clothing that her husband wore when he was killed and stated that the right-hand pocket of the overalls had recently been repaired by her because of holes in the bottom of it and which repairing consisted in sewing a seam higher up on the pocket so as to make the bottom of it from the outside opening much shorter than it was before it was so mended.

There are other facts and circumstances in the case, more or less bearing upon the material issue as to which one was to blame for the fatal conflict, but which we do not consider it necessary to recite further than what has already been done, since the picture we have drawn from the testimony in the case clearly establishes the fact that the evidence produced a submittable issue and was sufficient to support the verdict of the jury. We will now return to the grounds, supra, urged for a reversal of the judgment.

1 Ground (1) is based upon the testimony which we have referred to concerning the illicit liquor traffic in the community and which was evidently admitted, to the extent that it was, for the purpose of showing a motive on the part of the defendant, and which under an unbroken line of opinions of this court rendered it competent to prove the motive, if any, that may have prompted defendant in perpetrating the homicide.

2. Nathan Johnson had stated, perhaps more than once, both on direct and cross examination, what he claimed to be all of the facts and happenings that transpired at the meeting of the uncle and nephew in front of his house, and counsel for defendant was attempting to carry him over the same ground, and the court finally interfered and said: "He said it once." If counsel had been stopped in his effort to develop what occurred, and which development had not already been made, his argument in support of this ground would be, to say the least of it, much more convincing; but, since the facts that he wished repeated had already been given by the witness more than once, it cannot be said that it was error for the court to terminate the examination in the manner it did.

3. The argument in support of ground 3 against the admission of the clothing of deceased is based upon the contention that there was no dispute as to what part of the body of the deceased the bullet entered, and that, since it did not penetrate any of his clothing there was no necessity for its introduction. Abstractly speaking, the argument might be accepted as technically correct; but even in that event, and in the absence of any other purpose to be served by the exhibit, it is difficult to see how its introduction could have any prejudicial effect, and in such case we would be disinclined to reverse the judgment for the alleged error. But, as the record points out, the chief object and purpose of the introduction of the clothing was to show the condition of the right-hand pocket of the overalls of the deceased, and to thereby establish the fact that it was so shallow, after having been repaired by Mrs. Dexter Cole, as to render it probable that his knife rolled out or fell out of his pocket from the jar of his body when he fell downhill upon the ground after being shot, and to thus account for the unopened knife that the witnesses found there. Such testimony clearly tended to contradict the contention of defendant that deceased had drawn, or was in the act of drawing, his knife from his pocket at the time he was shot, and to thus deprive or take away from the defendant his only alleged right to kill deceased. Counsel for defendant does not reply or refer to such purpose for the introduction of the garment, and we are convinced that it was admissible and the jury had the right to give it whatever weight it saw

proper on the issue of whether or not the shooting was excusable under defendant's right of self-defense.

4. Instruction No. 1 submitted in appropriate language defendant's guilt of willful murder, unless he did the killing "not in his necessary or *apparently* necessary self-defense"; while instruction No. 2 submitted the crime of voluntary manslaughter unless the jury believed the killing was done in the same manner and which (manner) is submitted in the same words. Ground 4 is bottomed on a criticism of such phraseology by insisting that the words "apparently necessary," were inappropriate and fatally erroneous without its having been stated that such *apparent* necessity must have manifested itself to defendant, and that without such informing statement from the court the instruction is fatal and prejudicially erroneous. The argument is so made, notwithstanding instruction No. 4 submitted defendant's right to shoot deceased in the exercise of his right of self-defense if "he had reasonable grounds to believe, and in good faith did believe, that the deceased, Dexter Cole, was then and there about to inflict upon him death or some bodily harm, at the hands of the said Dexter Cole, and that to shoot, wound, and kill the deceased was necessary, or seemed to the defendant in the exercise of a reasonable judgment to be necessary, in order to avert that danger, real or *to the defendant* reasonably apparent," etc. Under the rule that all instructions should be looked to, and if one of them cures a minor defect in another the error in the latter will be considered as immaterial, the argument embodying the criticized instructions Nos. 1 and 2 is fully met by the phraseology that we have inserted from instruction No. 4, the self-defense one.

However, we are not inclined to agree with learned counsel that instructions 1 and 2 are materially erroneous, even in the absence of the curative effect of instruction No. 4 referred to, since it is our conclusion that the jury could not possibly have been misled with regard to the person to whom the apparent danger mentioned in instructions 1 and 2 referred to. Clearly, no average mind would reach any other conclusion than that such apparent danger must appear to the defendant on trial who was the one to judge of its extent and to act upon such appearance while in the exercise of a

reasonable judgment. We, therefore, conclude that this ground is without merit.

5. Lastly, it is argued in support of ground 5 that certain remarks of counsel in his argument were prejudicially erroneous to such an extent as to authorize a reversal of the judgment. The remarks so complained of are: "What the defendant could not make up with evidence, he tried to make up with lawyers in argument." "You have got this boy over there facing the pen for life or death." "I don't know a worse man than that. We gathered up his neighbors around there and they all say his character is bad." And, "You are not going to turn a man loose on the community of the character we have shown this man to be." We by no means agree with learned counsel that any of the inserted remarks transgressed the approved latitude that may be exercised by counsel in presenting his client's cause to the jury. Defendant's reputation in the community was proven to be bad, and he introduced no evidence in support of it. Counsel insisted on a conviction of murder instead of manslaughter, and in which event it was truthfully stated by him that defendant was "facing the pen for life or death." Perhaps counsel may have been mistaken when he referred to defendant as occupying the pinnacle of the list of bad men when he referred to his destroyed and unsupported character, but it surely cannot be insisted that, even if counsel was so mistaken, an error was committed authorizing a reversal of the judgment. The facts were all before the jury, as well as counsel's reason for his characterization, and being men of ordinary intelligence and prudence, they cannot be regarded as giving to the remarks any adverse effect to defendant.

Section 353 of the Criminal Code of Practice authorizes a reversal of a judgment of conviction for the commission of a felony only when the error relied on prejudiced the substantial rights of the defendant. When they do not do so, the conviction should be approved. At an earlier date courts were more strict in the effect they gave to technical violations of the practice, out of caution to safeguard the rights of an accused defendant, and they frequently reversed convictions for only extremely technical violations of prescribed practice. But in this day of more enlightened

jurors, plus authority conferred by such enacted sections as 353, supra, the many avenues of escape from convictions open to the defendant under such former practice have been closed, and a more just rule towards society, represented by the commonwealth, is now applied, and which, we repeat, is that if the testimony sustains the verdict of conviction and the error relied on for its reversal is unsubstantial, immaterial, and clearly without merit, the verdict and the judgment pronounced thereon will not be disturbed. Under that rule, even if some of the errors complained of should be considered as established, we do not think they should be given the effect contended for.

Wherefore, the judgment is affirmed.