## Deaton et al. v. Commonwealth.

Nov. 11, 1941.

S. M. Ward and Don A. Ward for appellants.

Hubert Meredith, Attorney General, and A. E. Funk, Assistant Attorney General, for appellee.

248

Wilmore and Jack Deaton were indicted jointly in the Perry circuit court, accusing them of "the crime of maliciously cutting and wounding another with intent to kill. Committed in manner and form as follows, to-wit: The said Wilmore Deaton and Jack Deaton in the said county of Perry on the 17th day of November, 1940, and before the finding of this indictment, with force and arms unlawfully, willfully, maliciously did cut, stab and wound *Tolbert Campbell* and *Boyd Eversole* with a felonious and malicious intent to kill them, the said Tolbert Campbell *and* Boyd Eversole, but from which cutting, stabbing and wounding death did not ensue, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the Commonwealth of Kentucky." (Italics ours.)

The indictment was returned under Section 1166, Kentucky Statutes, the here pertinent part of which provides:

"If any person * * * shall willfully or maliciously cut, strike or stab another with a knife, sword or other deadly weapon with intention to kill, if the person so stabbed, cut or bruised die not thereby, * * * he · and any person who aided, counselled, or advised or encouraged him, shall be confined in the penitentiary not less than two or more than twenty-one years."

The case coming on for trial, the defendants demurred to the indictment on the ground that, because of its accusing the appellants with cutting and wounding both Tolbert Campbell and Boyd Eversole upon the occasion in evidence, the same was defective as violating Section 126, Criminal Code of Practice, providing that "an indictment * * * must charge but one offense," etc.

By way of avoiding this objection to the indictment, the commonwealth filed a motion to be permitted to elect as to which one of the two charged offenses named in the indictment it would try the appellants on. The court having sustained such motion, the commonwealth, upon making its election, moved to dismiss that part of the indictment charging defendants with cutting and wounding Tolbert Campbell, which motion was sustained. The court then overruled the appellants' demur-

rer to the indictment, no longer charging two offenses, to all of which the defendants objected and excepted.

Upon the appellants' then trial had on the corrected indictment, charging them only with the one offense of cutting and wounding Boyd Eversole, the testimony introduced was very confused and conflicting as to the circumstances, motivating cause and conditions under which this fight occurred, for which the Deatons were jointly indicted, charging them with severely cutting and wounding the prosecuting witness, Boyd Eversole.

However, the facts as disclosed by the record are to the effect that on Sunday evening, November 17, 1940, the appellants, Wilmore and Jack Deaton (defendants below), together with their two friends, Ivory Johnson and Dan Woods, left their homes at Naphor, a small railroad station, to go up to see a picture show running at Busy, Ky., some seven miles distant up the railroad.

On this same evening, it further appears that a second group or party of some seven or eight persons, mostly young girls and their escorts, all of whom lived at or near the small railway station of Yerkes, located between Naphor and Busy and some three-quarters of a mile below the latter town, also went up there to see the same picture show.

Among and forming this Yerkes group there were the prosecuting witness, Boyd Eversole, Tolbert Campbell, May Campbell, Ray Fugate, Pauline Campbell, Walter Fugate, Emily Asher, Charlie Feltner and Reesie Caldwell.

It further appears that this last-named member of the party, Reesie Caldwell, was then and for some time prior thereto had been the sweetheart of the appellant, Wilmore Deaton, and that, just three days before the Sunday evening upon which the fight in question occurred between these two groups attending the picture show, she had written Deaton, her "steady," a postcard, telling him that he needn't come to see her on this Sunday evening, as she would not at such time be at home as she would be then continuing her visit in Clay county.

It further appears that when the appellants and their two friends, Johnson and Woods, reached Busy, they at once went to the picture show, where they were much surprised to find Wilmore's sweetheart, Reesie

Caldwell, in company with Tolbert Campbell, who was acting as her beau and escort.

Also it is testified that upon making this discovery and while at the show, Wilmore Deaton's friend, Ivory Johnson, accosted Reesie's escort, Tolbert Campbell, asking him if he had a pistol, and upon his refusal to inform him, he attempted to search him but was not permitted by Campbell to do so.

Further it appears by the testimony of the appellants that upon their later, during the show, discovering that their two friends, Johnson and Woods, had gone or left the show, they too then left to look for them, but failing to find them anywhere at Busy and concluding that their friends might have started back to their homes at Naphor, they started down the railroad track towards home in an attempt to overtake them; that failing in this, upon reaching Yerkes (some three-quarters of a mile below Busy) and finding two men there sitting on the railroad track nearby, they inquired if they had seen anything of their two lost friends, Johnson and Woods, to which their reply was that they had been sitting there on the track for about an hour, but had seen nothing of them. It further appears that appellants thereupon turned and started back to hunt further for them at Busy, but after going about half the way back, they met this Yerkes group of young people coming down the track on their way home from the show; that among them they again saw Tolbert Campbell with Reesie Caldwell, whom he was escorting back to her home in Yerkes, and also, close behind them with Ray Fugate, was the prosecuting witness, Boyd Eversole, who it is admitted was then a stranger to them.

Without attempting to further detail all the various encounters which then took place between the Deatons and several members of the Yerkes group, it appears (according to the testimony of the Yerkes group, who testified for the commonwealth) that upon the appellants meeting them and seeing Campbell escorting Wilmore's sweetheart, Reesie Caldwell, the Deatons, as if running amuck in their jealous rage, at once set upon Campbell, cutting and stabbing him until, due to the timely assistance and intervention of his friends in the party, he was able to break loose from the appellants and ran up the bank of the railroad track and then back down it at

about the point where Boyd Eversole was then walking with Ray Fugate and Pauline Campbell.

Practically all the witnesses, except the appellants, testify that Boyd Eversole, at the time Campbell was attacked, neither said anything nor took any part in this sanguinary brawl, stating that "it was none of his fight." However, they state that when Tolbert Campbell, the appellants' special quarry or object of their jealous hostility, escaped their vengeance, the appellants, without waiting for cause or provocation to be given them, next attacked Boyd Eversole, an unknown onlooker, by one of them striking him a blow in the head, dazing and knocking him to the ground, when they both jumped on him and began cutting and stabbing him. Eversole states that upon somewhat recovering from his dazed condition, having a gun and finding himself thus attacked by appellants (whose names, he states, he did not even know), he reached in his pocket for his gun, with which to defend himself, when a mad scramble ensued for its possession and that, while wresting his gun from him, they continued with their knives their sanguinary assault upon him. Upon Eversole's being rescued from this attack, by the intervention of some of his friends in the Yerkes crowd, he was rushed to an emergency hospital, where Dr. Jackson testifies he treated him and found eleven cuts on his body.

It is unnecessary to here also detail the varying accounts given by the appellants as to the circumstances under which this seemingly unwarranted and unprovoked attack was made upon Eversole, as we deem it sufficient to say, in answer to appellants' contention that they were, upon the evidence heard, entitled to a peremptory instruction, that there was ample and direct proof given, by five or six eyewitnesses to the effect both that appellants attacked Eversole and that it was an entirely unprovoked one, wherein they seriously and severely cut and wounded him.

At the conclusion of all the evidence introduced upon their joint trial, the jury, under the instructions of the court, returned a verdict finding the appellants each guilty as jointly charged and fixed their punishment at two years' confinement in the state reformatory.

Appellants thereupon severally filed their motion and grounds, each on his own behalf, for setting aside

the verdict and for a new trial and also each a supplemental motion and grounds therefor, which, when responded to by the commonwealth, were by the court overruled and judgment pronounced on the verdict.

Appellants, challenging the propriety of the court's order denying them a new trial, have appealed, assigning as grounds warranting a reversal of the judgment that: 1. (a) The demurrer to the indictment and (b) the motion of appellants for a peremptory instruction should each have been sustained; and (2) the court erred in its instructions to the jury.

We will now undertake to dispose of these objections in the order presented.

In support of their first objection, appellants contend that their demurrer to the indictment should have been sustained, for the reason that it charged appellants with the commission of more than one offense, where it jointly charged them with the cutting and wounding of both Tolbert Campbell and Boyd Eversole and that for such reason the indictment was bad, as being in violation of Section 126, Criminal Code of Practice, providing that:

"An indictment, except in the cases mentioned in the next section, must charge but one offense, but, if it may have been committed in different modes and by different means, the indictment may allege the modes and means in the alternative."

We are of the opinion that this criticism of the indictment as drawn would have been meritorious and have required the court's sustaining the demurrer thereto had it not been corrected by the motions then made by the commonwealth, as above stated, that it be permitted to elect as between the charged offenses, viz., the one, that of cutting and wounding Tolbert Campbell, and the other, that of cutting and wounding Boyd Eversole, with intent to kill, and that, having elected to dismiss the indictment's charge as to Campbell, it would proceed to try appellants on its one charged remaining offense, that of cutting and wounding Boyd Eversole.

Having thus by election corrected such original defect in the indictment, of charging two offenses, appellants' demurrer still urged thereto was clearly without merit.

This identical question was presented and so dealt with in the case of Commonwealth v. Reinecke Coal Mining Co., 117 Ky. 885, 79 S. W. 287, 289, where the court, in answer to the insistence of appellants that their demurrer to the indictment (claimed, as here, to be defective as charging more than one offense) should have been sustained, said:

> "We therefore incline to the opinion that the demurrer should not have been sustained on this ground. But if we are mistaken in this conclusion, and should concede that the demurrer ought to have been sustained because two offenses are charged in the indictment, nevertheless it would have been error for the court to dismiss the indictment on that ground, for when a demurrer is sustained to an indictment because of its charging two offenses the proper practice is to allow the commonwealth's attorney to elect for which of the two offenses he will prosecute the defendant in the indictment."

The proper practice, as in such case designated, having been here observed, it follows that this contention of appellants, in still insisting that their demurrer should have been sustained, is without merit. Further it is our conclusion that the demurrer was likewise properly overruled where based on the ground that the indictment was duplicitous in charging the two defendants with the commission of the one offense. Commonwealth v. Lawson, 165 Ky. 4, 176 S. W. 359.

As to the second of the grounds urged, that appellants' motion for a peremptory instruction should have been upheld, it may be noted that while appellants recite such ground for reversal, they have, by their failure to do more than merely make this brief statement of the point, without further discussing it or advancing any argument in its support in their brief, apparently abandoned it. Yet, however made, we can not concur with appellants in their contention, as we regard the motion as being one clearly without support or merit, in view of the positive and direct evidence of several eyewitnesses to this encounter that Boyd Eversole was attacked, cut and stabbed by the appellants, with no cause or provocation given them.

While the testimony of the witnesses is very conflicting and badly confused as to the cause and circum-

254

stances of the appellants running amuck upon this occasion, there is no testimony tending to inculpate Eversole, in that it is testified that neither by gesture nor threat had he done anything to bring about appellants' bloody cutting and stabbing attack he claims they so wantonly made upon him.

We will now turn our attention to a consideration and disposition of the final objection urged by appellants, that the court erred in its instructions given the jury.

Five instructions were given by the court.

By instruction No. 1 the jury were told that if they "shall believe from the evidence beyond a reasonable doubt, that in this county and before the finding of the indictment herein, the defendants, Wilmore Deaton and Jack Deaton did unlawfully and maliciously and not in their necessary or reasonably apparent necessary self-defense or the defense of either of them, cut, stab and wound Boyd Eversole with a knife * * *, with the felonious and malicious intent to kill the said Boyd Eversole, but from which cutting, stabbing and wounding he did not die, then the jury should find the defendants guilty as charged in the indictment and fix their punishment at confinement in the State Reformatory for not less than two nor more than twenty-one years in their discretion."

By instruction No. 2 the jury were told that if they "shall believe from the evidence, beyond a reasonable doubt that in this county and within twelve months before the finding of the indictment herein, the defendants, Wilmore Deaton and Jack Deaton, did in sudden affray or in sudden heat and passion, without previous malice, and not in their necessary or reasonably apparent necessary self-defense, or in the defense of either of them, cut, stab and wound Boyd Eversole with a knife, a deadly weapon in the manner described in Instruction No. 1, without killing him, then the jury should find the defendants guilty and fix their punishment at a fine of not less than $50 nor more than $500 in their discretion or by confinement in the county jail for not less than six months nor more than one year, or they may both so fine and confine the defendants, in their discretion."

Instruction No. 1 appears to be a proper one to the extent it correctly sets out the law of the case applicable

to the phases of which it treats, yet it may be conceded that it is defective to the extent that it contains no provision specifically separating the defendants, so as to authorize the jury to find one of these jointly indicted defendants guilty and acquit the other, or to find one guilty under this instruction and the other guilty of the lesser offense, as authorized under instruction No. 2.

Further it is our view that instruction No. 2 is also likewise correct to the extent of the applicable law stated, but that it is defective in respect to the same error or omission pointed out as occurring in instruction No. 1.

However, instruction No. 3 does so speak separately of the defendants, as by it the jury were told or directed that if they "shall believe from the evidence, beyond a reasonable doubt, that *the defendants, or either of them,* have been proved guilty, but shall have a reasonable doubt as to the degree of the offense committed, then they should find *him or them* guilty of the lower offense and fix *their or his* punishment as set out in Instruction 2." (Italics ours.)

And again the jury were told in the self-defense instruction (No. 4) that if they "shall believe from the evidence beyond a reasonable doubt that the *defendants * * * or either of them,* cut stabbed and wounded Boyd Eversole, as set out in the indictment, yet if the jury shall believe from the evidence that at the time they or he did so, *they or either of them* believed, or had reasonable grounds to believe, that *they or either of them* were in danger of death or some great bodily harm at the hands of Boyd Eversole * * * and that it was believed by the *defendants or either of them* in the exercise of a reasonable judgment to be necessary to cut and stab Boyd Eversole in order to avert that danger, real or to *them or either of them* apparent, then the jury should find the defendants not guilty upon the grounds of self-defense or apparent necessity." (Italics ours.)

By instruction No. 5 the jury were told that "if upon the whole case you shall have a reasonable doubt of the *defendants or either of them* having been proved guilty, then you should find *them or him* not guilty." (Italics ours.)

It is apparent from this review of the court's five instructions given that, even if instructions Nos. 1 and 2

were defective in not speaking separately of the defendants or specifically separating them (or, that is, contained no provision authorizing the jury to find one defendant guilty and acquit the other or to find one guilty under instruction No. 1 and the other guilty of the lesser offense under instruction No. 2), such omission or defect in those instructions was cured by instruction No. 3, containing such qualification or specific separation of the defendants by telling the jury that if they should believe from the evidence, beyond a reasonable doubt, that the defendants, *or either of them,* had been proven guilty, but had a reasonable doubt as to the degree of the offense committed, they should find *him or them* guilty of the lower offense and fix *their or his* punishment as set out in the instruction.

Again in instruction No. 5 was the specific separation of the defendants made in telling the jury that if upon the whole case they should have a reasonable doubt of the *defendants or either of them* having been proven guilty, then they should find *them or him* not guilty.

It is the contention of appellants that because of the stated defect or omission in instructions Nos. 1 and 2, the appellants were so prejudiced thereby as to entitle them to a reversal of the judgment, regardless of whether the criticised omissions in instructions Nos. 1 and 2 might be remedied by the reading and consideration of those instructions with the other instructions given by the court.

The rule as to the construction of instructions on appeal is thus stated in the excellent late work of Stanley's Instructions to Juries, Section 801, page 1060:

"All instructions must be considered together in determining whether there was error in any one of them, for an omission or error in one may be supplied by another. (Young v. Commonwealth [12 Bush 243], 75 Ky. 243; Connor v. Commonwealth, 118 Ky. 497, 81 S. W. 259; Cole v. Commonwealth, 260 Ky. 554, 86 S. W. (2d) 305) If the instructions as a whole present the law of the offense charged, they are sufficient and it does not follow that because one instruction is erroneous the accused was prejudiced. Instructions are to be read together. Each one qualifies or limits all others."

Also, in Section 798 (entitled ''Technical inaccuracies'') of the same authority it is further said:

''The purpose of instructions being to submit the law applicable to the facts in a form which is capable of being clearly and easily understood by the jury, if when read together and considered as a whole their purpose is achieved, instructions are sufficient.''

Further in Section 800, page 1059, thereof, it is said:

''It is not practicable or necessary that each instruction should be complete in itself or contain the whole law of the case applicable to the phase that it treats of. The instructions are to be considered as a whole; and if when so considered they present the entire law of the case with substantial accuracy, it will be sufficient. In determining whether there was error, an omission in any one may be supplied by another.'' (See notes Nos. 1 and 2 under this section, where many Kentucky and other authorities are cited in support of the text.)

The rule is further that not only error but injury must be shown to justify a reversal for error in the instructions.

Invoking the aid of these rules for our construction of the instructions here given, we are led to conclude that the appellants were not prejudiced by the instructions of the court when read and considered together, for the reason that, conceding there existed the error or defect stated in the court's instructions Nos. 1 and 2, by reason of the instructions' failure to run as to the defendants or either of them, such failure was obviously cured and remedied by the later instructions as hereinabove set out.

Therefore, perceiving no error in the instructions prejudicial to the defendants when same are read and considered as a whole, we are of the opinion that the judgment should be and it is affirmed.