349 S.W.2d 686 (1960)
Taylor MADDOX, Sr., Appellant,
v.
COMMONWEALTH of Kentucky, Appellee.
Court of Appeals of Kentucky.
August 12, 1960.
Rehearing Denied October 20, 1961.
*688 Grant F. Knuckles, W. R. Lay, Pineville, William L. Rose, Williamsburg, Lewis & Weaver, London, for appellant.
John B. Breckinridge, Atty. Gen., William F. Simpson, Asst. Atty. Gen., for appellee.
PALMORE, Judge.
This appeal is from a judgment entered on a jury verdict finding the appellant, Taylor Maddox, Sr., guilty under KRS 431.170 as an accessory after the fact to the murder of Woodrow Smith and fixing his punishment at one year in jail and a $1,000 fine. The circumstances of the homicide are set forth in Warren v. Com., Ky. 1960, 333 S.W.2d 766, wherein the conviction of John Henry Warren, the principal, was affirmed.
It is contended that the trial court erred to appellant's prejudice in (1) overruling his motions for a directed verdict, (2) receiving incompetent testimony, (3) instructing the jury, and (4) overruling his objections to improper argument to the jury by counsel.
On March 31, 1959, a large number of striking miners met at Arjay, some four miles from Pineville in Bell County, Kentucky, for the purpose of proceeding to and picketing various mines in the area. In charge of Maddox, a union field representative, they visited one location in Bell County and then set out for Woodrow Smith's mine on Stinking Creek in Knox County. The intention, according to Maddox, was to unionize Smith's men and talk to him about a contract with the union. John Henry Warren and John "Billygoat" Cox, both of whom lived at or near Arjay, where the cavalcade originated, were among the passengers riding in Maddox's station wagon. Maddox, however, did not witness the murder. His car was parked a mile or so from Smith's mine, and he was first informed of the crime when Warren returned to the automobile, told Maddox there had been a shooting, that he had shot a man, and asked advice as to what he should do, whereupon Maddox recommended that he give himself up to the authorities. Maddox then drove Warren and Cox to Barbourville, county seat of Knox County, and there gave Warren a $10.00 bill and advised him to get a taxi. Warren and Cox accordingly took a taxicab from Barbourville to their respective homes in Bell County. The Sheriff of Bell County called on Warren the next day for the purpose of serving a subpoena to appear as a witness before a court of inquiry to be held at Barbourville, and at this time Warren reported that he had killed Smith and produced the fatal weapon from a coal pile near his home.
An accessory after the fact is one who, knowing a felony to have been committed, receives, relieves, comforts or assists a person whom he knows to be the felon, intending thereby to enable the felon *689 to escape arrest or detection. Certainty of knowledge is not required. It is sufficient that the accused had actual knowledge of facts which would give him good reason to believe the person assisted to be the felon. 22 C.J.S. Criminal Law §§ 95-97, pp. 165-167; Tully v. Com., 1877, 13 Bush 142, 76 Ky. 142; Clark v. State, 1953, 159 Tex.Cr. R. 187, 261 S.W.2d 339. As quoted in Roberson v. State, 1943, 69 Ga.App. 541, 26 S.E.2d 142, 143, from an earlier decision, "One cannot refrain from following up a clue, for fear of discovering the truth, and then shield himself behind such intentional ignorance."
Any assistance whatever given to a felon to hinder his being apprehended, tried, or suffering punishment makes the assistor an accessory, IV Blackstone 37. "The true test for determining whether one is an accessory after the fact is, to consider whether what he did was done by way of personal help to his principal, with the view of enabling the principal to elude punishment,  the kind of help rendered appearing to be unimportant." I Bishop's Criminal Law 365 (§ 634).
On the other hand, actions that alone will not render one an accessory include (1) acts of charity that relieve or comfort a felon without tending to hinder his detection, apprehension or conviction, nor aid his escape, (2) nondisclosure of the crime, and (3) failure to apprehend or attempt to apprehend the criminal. 22 C.J.S. Criminal Law §§ 97-99, pp. 168-169.
Whether the evidence of Maddox's conduct following the shooting of Smith by Warren is sufficient to sustain his conviction as an accessory after the fact must be tested within the alembic of the foregoing concepts.
The information imparted to Maddox upon Warren's return to the automobile was certainly enough to put him on notice that a felony had been committed by Warren. That in fact it did so is affirmed not only by his recommendation then and there that Warren give himself up to the authorities, and by the course of his conduct thereafter, but more particularly by the following admission on cross-examination:
"Q. You knew the man had committed a felony, didn't you? A. I thought so."
It is contended, however, that the evidence did not prove Maddox was given enough details of the shooting to know at the time whether the victim was dead or alive, hence he could not have known a murder had been committed. At common law one could not be an accessory unless the felony was complete. "Thus, aiding the guilty party after he has given another a mortal wound, but before death has resulted therefrom, does not make the person giving such aid an accessory to the homicide." Roberson's New Kentucky Criminal Law and Procedure (2d ed.), § 190; I Bishop's Criminal Law 364, (§ 632); 14 Am. Jur. 837 (Crim. Law, § 102); Harrel v. State, 1861, 39 Miss. 702, 80 Am.Dec. 95. It must be recalled, however, that "under the common law an accessory after the fact was subject to the same punishment as the principal, 5 Blackstone p. 449; our statute reduced the offense to a misdemeanor." White v. Com., 1945, 301 Ky. 228, 191 S.W. 2d 244, 247. This circumstance is relevant in that the degree of punishment may then have required a greater nicety of proof than should now be considered necessary. Under our statute, KRS 431.170, the accessorily crime is a misdemeanor, an offense without degree, not dependent on the degree of the principal's crime, but only on his guilt of felony.
The culprit's work was complete when he fired the fatal shot or shots. He had committed a felony. Whether the victim lived or died fixed the gravity of his crime and the severity of punishment authorized by the law to be inflicted upon him, but it had no such relationship to an accessory after the fact. Therefore, the reason for the common-law rule just stated does not apply. It is our opinion that the *690 jury was authorized to find from the evidence that Maddox had sufficient information to put him on notice that Warren had committed a felonious shooting. This was enough to lay upon Maddox the interdict of the law against rendering assistance to him.
The main assault on the evidence is that there was no proof of any design by Warren, the murderer, to escape detection or elude the processes of the law, nor of an intent by Maddox to help him do so. Maddox's story was that he took Warren to Barbourville in order that he might surrender himself, but Warren became fearful lest he be subjected to violence and decided he would rather give himself up to the Sheriff of his home county at Pineville, whereupon Maddox gave him the money to take a taxi to Pineville for that purpose. Had the jury chosen to believe this version, an acquittal should and presumably would have resulted. Since, however, it was not incumbent on the jury to accept his testimony at face value, we must consider whether the evidence as a whole sustains a verdict on the theory that Maddox's actions proceeded from a criminal intent.
On the trip from Stinking Creek to Barbourville Maddox had three passengers, Warren, Cox and Arthur Lee Hamlett. He stopped first at a small store on the way out and paid a bill of some $72 for food, cigarettes, etc., bought there by the members of the picketing party on their way in. After reaching the main highway to Barbourville he stopped and attempted to reach his union superior in Middlesboro by telephone in order to report the shooting. On reaching Barbourville he parked at or near the court house square and placed or attempted to place another telephone call, to whom and for what purpose is not clear from the record. Maddox then drove a mile or so away from the court house to the railroad crossing at the edge of town, on the route to Pineville, where, according to the witness Cox, he "said he would give us boys the money and we would get a taxi and go home." (Emphasis added.) Maddox and his remaining passenger, Hamlett, thereupon departed in the direction of Pineville, which was on the way toward Maddox's home in Middlesboro. Warren and Cox returned by taxi to their home at Arjay, passing through Pineville en route.
Cox did not recall hearing Warren's having said anything at all about giving himself up, nor, specifically, did he hear any mention of Warren's being afraid to surrender at Barbourville. Cox testified that it was he (Cox) who made the suggestion to Maddox that it would be a "pretty good idea" for him and Warren to go to Pineville in a taxi. He admitted that on a former trial (apparently the trial of Hamlett as an accessory, which resulted in an acquittal by direction) he had explained the matter as follows:
"Q. Why didn't you go back to Pineville with Maddox? A. He named something about wouldn't it be a pretty good idea for us to go through in a taxi and I told him I would.
"Q. Thought it a pretty good idea to go through in a taxi? A. Yes."
Cox testified that he urged Warren to surrender himself at Pineville, as follows:
"Q. Did you ever say anything to Warren about giving up in Pineville? A. I did.
* * * * * *
"Q. Why didn't Warren give up in Pineville? A. I don't know anything about it.
"Q. Was anything said about it? A. I don't know whether anything was or not. Might have been something said about it. I don't remember.
"Q. In other words, you say there might have been something said about him giving up in Barbourville? A. I don't remember whether there was or not. I just know Maddox took him to Barbourville.

*691 "Q. You don't know whether anything was said about giving up or not? A. I don't know whether he said anything about it.
"Q. You tried to get him to give up in Pineville? A. I told him to go to Pineville and give up.
"Q. In other words, you were suggesting that you and him go to Pineville? A. I was getting in home."
Thus it may be seen that apart from Maddox's own version of the matter there was very little in the evidence to persuade the jury that his motives were simon-pure. Neither Warren nor Hamlett appeared as a witness. Cox heard no talk of surrender from Warren, and according to his testimony Maddox said he would give them the money to get a taxi and go home. To go home, conceal or dispose of the murder weapon, and act as if nothing had ever happened was the obvious way for Warren to avoid identification as the assassin. Taking him out to the edge of town to call a taxi after being in the middle of Barbourville where telephones were plentiful and one might most reasonably expect to find a cab was an action from which the jury could scarcely have drawn any inference except that the purpose was to keep Warren out of sight. Actually, Maddox's course of conduct would have been more persuasive of his innocence had he taken Warren on home himself.
What Warren's own state of mind may have been during the course of the assistance rendered by Maddox is subject, of course, to the same inferences that may be drawn with respect to Maddox. We do not think, however, that an intent on the part of Warren to escape or avoid detection was necessary in order for Maddox to become an accessory. It was enough if Maddox himself knew or expected that the assistance rendered by him would promote such a purpose.
Under the circumstances of the case it is our conclusion that the evidence sustains the verdict.
With respect to the argument that incompetent and prejudicial testimony was admitted, the most serious question involves the evidence given by Mrs. Axi Mills, who lived at the point where Maddox turned his car in the road and parked about a mile below Woodrow Smith's mine. This occurred before the shooting. Witnessing the sudden appearance of the large group of 50 or more men, she asked in Maddox's presence, "What's this come in on us? Is this an army or something?" Someone replied, "Hell, yes." Mrs. Mills retorted, "I thought soldiers wore uniforms," which evoked from some unidentified member of the crowd the response, "You don't have to wear nothing when you kill them and throw them over the hill." It is contended that these statements had no bearing on whether Maddox was an accessory after the fact of the murder.
Though the conviction of an accessory after the fact does not depend upon that of the principal, the principal's guilt must be alleged and proved. Tully v. Com., 1874, 11 Bush 154, 74 Ky. 154; Roberson's New Kentucky Criminal Law and Procedure (2d ed.), § 194. Under the decisions of this court in Jones v. Com., 1933. 249 Ky. 502, 60 S.W.2d 991, and Reynolds v. Com., 1933, 249 Ky. 644, 61 S.W.2d 288, what was said and done by others during the course of the organized venture in which they and the murderer, Warren, were participants was competent as bearing upon the guilt of Warren. Its relevance to Warren's guilt likewise validates the other evidence of which appellant complains, by which the details of the killing by Warren were proved.
The indictment charged, in effect, that Warren wilfully murdered Smith and that Maddox, knowing he had done so, gave him assistance to avoid arrest and prosecution. *692 The first instruction given by the trial court deviated from the indictment by authorizing a conviction if Maddox aided or harbored Warren for the purpose of eluding punishment "at a time when he knew or had reasonable grounds to believe that the said John Henry Warren had shot and wounded Woodrow Smith or any other person, which shooting and wounding was a felony * * *." The instruction did, however, in proper form require as a prerequisite to conviction that the jury believe from the evidence beyond a reasonable doubt that Warren had wilfully and feloniously, of his malice aforethought and not in his necessary or apparently necessary self-defense, shot and killed Smith. Therefore, its effect was to say that if Warren murdered Smith, and Maddox, knowing that he had feloniously shot someone, gave him aid in order to escape, Maddox was guilty.
Earlier in this opinion we have indicated that, in determining Maddox's guilt, whether Smith's death had occurred at the time of the accessorily acts is an immaterial technicality, it being sufficient if Maddox had good reason to believe Warren had committed a felonious shooting. It would likewise be immaterial that Maddox may not have known the identity of the person shot. The fair import of the instruction conveyed this theory to the jury. Though it should have defined the elements of a felonious shooting, and we therefore cannot approve its form, neither can we say that the error was prejudicial. There was no room to speculate and no possibility of a mistake as to what was meant. An error in the instructions that is not susceptible of a misleading and prejudicial interpretation by the jury, and thereby conducive to an unjust verdict, will not justify a reversal. Deaton v. Com., 1941, 288 Ky. 246, 156 S. W.2d 94; Lee v. Com., Ky., 1951, 242 S.W. 2d 984; Abbott v. Com., 1947, 305 Ky. 620, 205 S.W.2d 348; Page v. Com., 1924, 202 Ky. 50, 258 S.W. 958.
That the requirements for conviction as presented by the aforementioned instruction were something less than what was alleged in the indictment is not fatal in view of the indictment's having charged more than was strictly necessary in order to state the crime. We think the case of Bradley v. Com., 1927, 218 Ky. 788, 292 S.W. 343, is distinguishable in principle. There a defendant charged with the murder of her baby by smothering, choking or strangling was convicted of voluntary manslaughter under an instruction embracing the theory of gross negligence in the taking of medicines or doing of other things to induce premature birth, thus causing the child's death after birth. The instruction authorized a conviction for a different act from the one described in the indictment, and the conviction was reversed. Here the act committed by Warren, notice of which was an element of the accessorily offense, was the same regardless of whether its final result was murder, voluntary manslaughter or malicious shooting.
In Moore v. State, 1956, 94 Ga.App. 210, 94 S.E.2d 80, 85, a conviction was sustained where the indictment charged the defendant with being an accessory after the fact of murder but the proof showed the principal's conviction of manslaughter instead. The following excerpt from the opinion is appropriate to this case:
"Proof that the principal, indicted for murder, was convicted of manslaughter, is still proof (prima facie) that the principal was guilty of a culpable homicide concerning the same transaction for which the defendant is on trial. It matters not to the defendant that the jury trying the principal found the killing to be without malice. His own crime is the same whether malice existed or not. His defense is the same. We are accordingly of the opinion that evidence that the principal was convicted of a lesser degree of the crime charged is admissible against the defendant on trial as an accessory after the fact for the same purpose and *693 to the same extent as though the conviction had been for murder * * * we conclude that the jury was authorized to find that the defendant knew that Grissette had killed Martin without justification and that by allowing him to ride in his automobile away from the scene of the crime  albeit for only a short distance  he aided Grissette in escaping arrest and that he was, therefore, guilty as an accessory after the fact."
Citing Bradley v. Com., supra; Hunter v. Com., Ky. 1951, 239 S.W.2d 993, 995; and Stanley's Instructions to Juries, § 764, appellant states the proposition that the instructions must be confined to the allegations and language contained in the indictment. None of these authorities announces such a principle. In the Hunter case, wherein it was held that instructions may not merely incorporate the indictment by reference, the rule is couched in this language: "The instructions should submit the elements of the offense as contained in the indictment." It is not necessary that the form or phraseology be the same. Stanley's Instructions to Juries, § 767. If the guts are there the feathers are inconsequential.
Our previous remark in this opinion to the effect that an intent by the principal to escape or avoid detection is not requisite in order for another to become an accessory after the fact disposes of the contention that Warren's intent should have been embraced in the instructions as an element of the accessorial offense.
We come finally to the question of improper and inflammatory argument by special counsel for the prosecution.
Appellant was and is represented by several distinguished counsel, a circumstance that elicited from the special counsel for the state in his closing summation this comment:
"Did you know that Al Capone, the biggest crook and rascal I guess the U.S. ever produced, sought just the same subterfuge that this man is using on this trial today  dodged the enforcement of the law and didn't pay the penalty of his crimes, because he had smart help and smart assistance and smart lawyers and plenty money * * *."
In considering the possible but unprovable effect of an argument to the jury a reasonable amount of common sense and fair judgment on the part of the jurors must be presumed. Shepherd v. Com., 1930, 236 Ky. 290, 33 S.W.2d 4. This allusion to the name of a man whose career has come to personify in the minds of the people of this country the evils of organized crime was but a graphic way of reminding the jurors that no man's case should be influenced or judged by his lawyers or his resources. The word "subterfuge" was, of course, unfortunate, ill-chosen and in poor taste, but in its over-all effect the argument drew no personal comparison between Maddox and Al Capone or their general proclivities, and we cannot say it was prejudicial.
The most telling argument of which complaint is made had to do with the callousness of Maddox's character as exemplified by his admitted failure to call a doctor or ambulance or to seek some sort of assistance for the victim of the shooting. It will be recalled that after learning of the tragedy and while the murderer, Warren, was in his automobile Maddox used the telephone at two different places, once en route and once in Barbourville. During this time, as he professed in the trial and continues to maintain on this appeal, he knew a man had been shot by his companion, Warren, and left on a remote hillside miles from town, but did not know whether he was dead or alive. Counsel for the prosecution made full use of the opportunity for forceful eloquence presented by these circumstances, and it is contended that the result was inflammatory and prejudicial.
In his defense the appellant called a number of witnesses, including a former circuit *694 judge, to attest his good reputation for morality, peace and quietude, and for truth and veracity. Through these witnesses it was brought before the jury, in one way or another, that he was a member of the Gideons, who distribute Bibles, a church board member and Sunday School teacher, and a good citizen. This, of course, is difficult sort of testimony to rebut in kind, and we do not regard it as an improper argument to contrast a man's reputation, as proven, with the evidence of his conduct in the case on trial. In the words of a rather unimpeachable authority it has been observed that men are best known by their fruits. Matthew 7:16-20. In the circumstances of the instant case we are inclined to regard this line of argument not only as proper, but rather appropriate. That it was not inflammatory is indicated by the relative moderation of the verdict.
There is one further particular in which it is contended that the argument transcended the limits of propriety. It was stated that if Warren had possessed enough intelligence and education to know that the subpoena the officers came to serve on him was not a warrant of arrest he might have kept the secret of his guilt, the implication being that Warren, mistakenly assuming an arrest, gave up only because he thought the jig was up. The inference that Warren did not know the difference between the subpoena and a warrant was, of course, based on speculation, there being no evidence to that effect. It is suggested that this statement was prejudicial "because the Commonwealth, having failed to prove that John Henry Warren was trying to elude punishment, sought to do so by way of argument to the jury." As we have said, however, whether Warren in fact intended to escape detection is not vital, because the real question was whether Maddox  not Warren  had a guilty purpose in that respect. The significance of the argument was to bring home to the jury how easy it might have been for Warren to escape detection by mere silence, thus supporting the theory that by expediting his return home Maddox had in fact rendered aid conducing to hinder his detection. Therefore, the substance of the argument was legitimate. Though it was not proper for counsel to suggest affirmatively that Warren did not know the subpoena was not a warrant, he could have presented the same theory in the form of a hypothesis to illustrate how the conduct of Maddox might have resulted in Warren's escape. In any event, we are not persuaded that the argument was prejudicial.
The judgment is affirmed.